**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS HUBIACK, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> LI-CYCLE HOLDINGS CORP., TIM JOHNSTON, AJAY KOCHHAR, and DEBBIE SIMPSON, <br><br> Defendants. | Case No. 1:23-CV-09894-JSR <br><br> <u>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u> <br><br> <u>CLASS ACTION</u> <br><br> <u>JURY TRIAL DEMANDED</u> |

Lead Plaintiff Thomas Hubiack (hereafter the "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Amended Class Action Complaint for Violations of the Federal Securities Laws (or the "Complaint") against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Li-Cycle Holdings Corp. ("Li-Cycle" or the "Company"), interviews with former employees of the Company, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a Class consisting of all persons who purchased or otherwise acquired Li-Cycle's common stock between January 27, 2022 and November 13, 2023, both dates inclusive (hereafter the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Li-Cycle is a Canadian company that purports to recycle end of life batteries and scrap into new lithium-ion battery packs for electric cars. The Company's "Spoke and Hub" model established four Spokes in the United States. At these Spokes, end of life batteries and scrap are shredded to produce a powder-like substance called black mass that contains valuable metals like lithium, nickel and cobalt. By itself, the production of black mass has minimal commercial value. While black mass can be sold to other manufacturers who refine it further to extract valuable minerals, it is worth far less than the end products contained within it. For this reason, Defendants intended to transport the black mass to a Hub where it could be processed into battery grade materials for electric cars.

3.      In September 2020, Defendants announced a plan to build a lithium-ion battery recycling Hub in Rochester, New York (hereafter the "Hub"). Defendants told investors that the Hub was critical to Li-Cycle's success and would be the most significant source of the Company's revenue. Throughout the Class Period, Defendants repeatedly claimed that the Hub was on schedule to be commissioned in 2023 despite any increase in the cost of labor and would cost no more than a range of $485 million to $560 million.

4.      As the Class Period progressed, the misrepresentations became worse with false claims that the Hub kept achieving "significant milestones," including advanced construction at process buildings and the full completion of a warehouse located within the Hub.  Defendants also repeatedly misled investors by suggesting that the Company's balance sheet was strong and robust, and Li-Cycle had sufficient liquidity to not only complete the Hub, but also fulfill its future growth plans for rapid expansion.

5.      Defendants knew or recklessly disregarded that these claims were false from the start.  The Complaint includes an account from a senior officer of the Company who reported directly to Defendants Tim Johnston ("Johnston"), the Company's Co-Founder and Executive Chair, and Ajay Kochhar ("Kochhar"), the Company's Chief Executive Officer ("CEO").  Confidential Witness ("CW") 1 states that, in the fall of 2021, the Hub was redesigned, increasing its complexity and infrastructure needs, but Defendants did not account for the additional contractors and labor required for the expansion.  In early 2022, CW1 explains that CW1 attended a meeting where Defendants were present, and the tone and demeanor of the attendees demonstrated that the Hub was headed in the wrong direction.

6.      CW1 also spoke to other senior executives with technical expertise, hands on experience and oversight of the Hub during the Class Period.  In the beginning of the Class Period, these senior executives told CW1 that the costs of the Hub exceeded the Company's budget, and that the true cost was $1 billion.  CW1 states that the Defendants did not want investors to know about the true costs, and believed that a grant from the Department of Energy ("DOE") would make up for the shortfall to keep the Hub alive.  So, in early 2023, when Defendants announced that the Company had received a conditional $375 million government funded loan, they initially claimed it was for future growth, but it was actually needed to bail out the Hub.  Defendants made

misrepresentations about this loan as well.  Between February 2023 and August 2023, Defendants told investors that the DOE loan would close in 2023 and only some bureaucratic requirements involving mere paperwork were left to be completed.  However, Defendants knew that they could not close on the loan because the DOE requires the loan recipient to make a significant equity contribution to the project.  As the costs of the project go up, so too does the equity contribution requirement, but Defendants never had the money to meet this obligation or the ability to pay the loan back at any time.

7.      CW1 left the Company in January 2023.  However, other CWs identified in this Complaint corroborate CW1's account and provide further evidence of Defendants' scienter in the later parts of 2023.  For example, according to CW2's account, no later than April 2023, an executive who ran the Hub on the ground told Johnston and Kochhar that the true costs of the Hub were between $850 million and $1 billion.  Both Johnston and Kochhar continued to mislead investors about the true costs of the Hub after that.  As another example, CW3 states that, in the middle of 2023, the Company's Chief Financial Officer ("CFO") ("Simpson"), Defendant Debbie Simpson, shut down all travel to and from the Hub, signaling the project's end.  But all three Individual Defendants continued to cause Li-Cycle to issue false statements until as late in the year as September 25, 2023.

8.      Kochhar's and Johnston's misconduct was particularly egregious.  Both knew that the true costs of the Hub were between $850 million and $1 billion no later than April 2023, as CW2 confirms.  Shortly thereafter, starting in May 2023, Kochhar and Johnston coordinated a plan to dump their holdings on unsuspecting investors at suspicious times and did so until August 2023, collectively reaping a windfall of approximately $11.5 million.

9.      Barely a month after the last false statements were made, on October 23, 2023, Li-Cycle announced that it would halt work at the Hub because of "escalating construction costs." On this partial disclosure or the materialization of the concealed risks thereof, Li-Cycle's stock price plummeted by nearly 46% from its previous day's closing price of $2.27 to close at $1.23.

10.      On November 13, 2023, Defendants finally provided investors with more details about the Hub's failure and the Company's disastrous state through a series of press releases and SEC filings and an earnings conference call held to announce the financial results for the third quarter of 2023.  Defendants finally admitted that the true costs to complete the Hub were $850 million to $1 billion, the same figures the CWs state Defendants already knew about before false statements were made to investors.  Defendants claimed that the rising costs related to labor, internal installation, completion of the warehouse and process buildings.  In addition, the Company terminated employees and shut down most operations to "preserve cash," disclosed a $96.5 million impairment charge associated with the Hub, and effectively conceded that it could not receive government funds without making substantial equity contributions towards the Hub first.

11.      On this news, the price of Li-Cycle's common stock again plunged by over 55% from its previous day closing price of $1.47 per share to close at $0.66 per share on November 14, 2023.

12.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) because Li-Cycle's common stock trades on the New York Stock Exchange ("NYSE"), and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District.  Accordingly, there are presumably hundreds, if not thousands, of investors in Li-Cycle securities located within the U.S., some of whom undoubtedly reside in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Plaintiff, as set forth in his previously filed declaration (ECF No. 24-4), acquired Li-Cycle common stock at artificially inflated prices during the Class Period and was damaged because of the federal securities law violations alleged herein.

18.     Defendant Li-Cycle is a corporation incorporated under the laws of the Province of Ontario, Canada, and its principal place of business is located in Toronto, Canada.  Li-Cycle's common stock trades on the NYSE under the ticker symbol "LICY."

19.     Johnston is a Co-Founder of Li-Cycle, and served as the Company's Executive Chair at all relevant times.

20.     Kochhar is a Co-Founder of Li-Cycle, and served as the Company's President and CEO at all relevant times.

21.     Simpson became the Company's CFO on February 1, 2022, and served in that role for the rest of the Class Period.

22.     Defendants Johnston, Kochhar and Simpson are sometimes referred to herein as the "Individual Defendants."  Li-Cycle and the Defendants are collectively referred to herein as the "Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of Li-Cycle's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Li-Cycle's SEC filings, press releases and other market communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Li-Cycle, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein.

## **SUBSTANTIVE ALLEGATIONS**

**Background**

24.     Kochhar and Johnston founded Li-Cycle in 2016.  The Company went public on August 10, 2021, via a merger with Peridot Acquisition Corp., a special purpose acquisition

company ("SPAC").  Companies seeking to go public have increasingly turned to SPAC structures in recent years.  SPAC transactions are faster than traditional Initial Public Offerings, the price is determined in advance instead of by the volatile market, and SPAC sponsors often have a network of contacts and management expertise they can offer to the new company.  However, SPAC mergers also have the potential to be rife with inaccurate disclosures and serious conflicts of interest, as the process allows companies to sidestep traditional underwriting and regulatory scrutiny.  SEC officials have also expressed concern over the recent surge in SPACs, in particular about the "baseless hype" by which many are sold.  *See* John Coates, "SPACS, IPOs and Liability Risk Under Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021).

25.  Li-Cycle purports to capitalize on the recent boom of the emission free industry with a particular focus on recycling used battery packs for electric vehicles.  It touts itself as "the leading lithium-ion battery recycler in North America."  The Company's "Spoke and Hub" model relies on four Spokes to shred and process end of life batteries and manufacturing scrap to produce "black mass" and other intermediate products.  Black mass is a powder-like substance that contains valuable metals such as nickel, cobalt and lithium.  Over the last few years, the Company has recognized a small amount of revenue from the sale of black mass.  For example, for the nine months that ended on September 30, 2023, the Company recognized $11.9 million from the sale of black mass after fair value pricing adjustments.  Over the same period, net losses ballooned to $205.2 million and the Company's cash on hand depleted to $137.4 million compared to a high of $615.6 million on September 30, 2022.

26.  Because the sale of black mass on its own was not (and is not) economically viable, Defendants' most important revenue stream depended on the construction and launch of the Hub.

Black mass is nowhere close to the value of battery grade materials, and while the Company generated a very small amount of revenue from its sales, the real driver of Li-Cycle revenues and profits was supposed to be the Hub.  Defendants recognized this crucial fact.  On a conference call held on March 17, 2022, to announce the results for the first quarter of 2022, Johnston told investors that "all of our Spoke facilities will feed our Rochester Hub."  Similarly, on a conference call held on March 15, 2023, to announce the results for the first quarter of 2023, Simpson told investors that the sale of black mass was only an "interim strategy," and transferring black mass to the Hub to produce battery grade materials was Li-Cycle's ultimate goal.

27.    Defendants intended to transport black mass to the Hub where it could be processed through a hydrometallurgical process to create battery grade materials, including nickel sulphate, cobalt sulphate and lithium carbonate.  These battery grade materials could then be sold to battery manufacturers at much higher prices than black mass.  Defendants claim that Li-Cycle's Spoke and Hub model has an efficiency rate of 95% with higher recovery rates and less carbon intensity than traditional recycling methods.

28.    In an Annual Report filed on Form 20-F on February 6, 2023, the Company stated that the sale of battery grade materials produced at the Hub "will represent the significant majority of its revenues."

**Johnston's Checkered Past**

29.    Before the Class Period, the TSX Venture Exchange Inc. ("TSX-V"), a stock exchange in Calgary, Alberta, found that Johnston made material misrepresentations to investors. Between February 23, 2018 and July 16, 2019, Johnston served as the CEO of Desert Lion Energy Inc. ("Desert Lion"), which was a lithium exploration and development company listed on the TSX-V.  Desert Lion claimed it was developing the first large-scale lithium mine in Namibia.

However, Desert Lion was in significant financial distress mere months after going public, and faced the prospect of imminent bankruptcy.

30.    In November 2018, Johnston caused Desert Lion to issue a false press release concerning a proposed financing of $5,000,000 that failed to disclose that the arrangement was subject to a $1,000,000 discount and a covenant that could give rise to a default.  Johnston was required to seek TSX-V's preapproval for this transaction.  Johnston signed and submitted a form to TSX-V that omitted to disclose the $1,000,000 discount as well as the covenant.

31.    After TSX-V learned that the proposed financing was discounted, Johnston submitted revised forms several times that continued to omit material information and failed to accurately disclose the true nature of the discount or the covenant.  In reliance on Johnston's false statements, the TSX-V approved the financing.  Desert Lion ultimately defaulted on the covenant and went back to the TSX-V to seek approval to issue new debt.  During its consideration of this new application, the TSX-V again discovered that Johnston had repeatedly made misrepresentations regarding the transaction.  An investigation followed.

32.    On May 11, 2020, the TSX-V published a decision that required Johnston to first seek the TSX-V's permission if he wished to serve as a director or officer of any company listed on the TSX-V.  The decision also stated that Johnston's application would not be considered unless (1) the application was made by a TSX-V listed issuer on Johnston's behalf, and (2) the issuer provided "satisfactory evidence" that a copy of the TSX-V's decision regarding Johnston's misconduct had been reviewed.

33.    On February 19, 2021, the British Columbia Securities Commission ("BCSC") affirmed the TSX-V's decision, which remains in effect to this day.  Before the BCSC, Johnston relied on an advice of counsel defense that was summarily rejected.  The BCSC determined that

Johnston's false statements did not involve "a question of any complexity or on which turns on any analysis of the law.  The disclosure was wrong on its face."  Re Johnston, 2021 BCSECCOM 79 ¶ 80.  Further, the BCSC concluded that it could not analyze an advice of counsel defense even if it was considered because Johnston failed to explain what legal advice was sought or given, and failed to provide any context to assess whether the defense could be reasonable or credited.

**The Hub Was Critical to Li-Cycle's Viability**

34.     On September 14, 2020, the Company announced that it would build a Hub facility at the Eastman Business Park in Rochester, New York.  An investment of $175 million in the Hub was made with construction expected to commence in 2021.  On December 14, 2021, the Company upsized the Hub to allow the facility to process 40% more black mass annually when complete. Defendants stated that this upgrade required a total capital investment of approximately $485 million.  The Hub's targeted completion date was originally pegged for 2022.

35.     On a conference call held on December 14, 2021, Johnston stated that the Hub "can be adequately funded by cash on hand," and that completing a Definitive Feasibility Study on the Hub brought the Company "to the last tollgate for a ***fully loaded*** estimated capital investment of approximately $485 million."[1]  Then, on January 27, 2022, Li-Cycle announced that it had broken ground on the Hub, which was executing "on time" and "on budget" to support start-up in 2023.

36.     Defendants themselves told investors repeatedly that the Hub was critical to Li-Cycle's success.  For example, on a January 27, 2022 earnings conference call, Johnston told investors that: "***I would say it is critical***. People often ask us, Daniel, what's more important, is it spoke or the hub? It's really – I mean you need the funnel, you need to be able to receive and

---

[1] Unless otherwise noted, all emphasis is supplied.

process those – materials on the front end, ***but the hub is the enabler that ensures that they're able to impart to meet that gap in terms of the critical materials***."

37.    Based on 2024 projected prices for nickel, lithium and cobalt, Defendants estimated that the Hub had total revenue potential of nearly $600 million.

38.    Throughout the Class Period, Defendants told investors that the Hub was on track to be commissioned no later than 2023, and that the total cost of the project would range between $485 million and $560 million.  However, the costs to commission similar facilities vastly exceeded the amount Defendants claimed was needed.  For example, a similar facility commissioned by Redwood Materials Inc. in Nevada in 2022 cost $3.5 billion.  Another company, Ascend Elements, stated on October 20, 2022, that it planned to invest nearly $1 billion in a Kentucky facility that would return recycled battery materials to the battery supply chain.  Indeed, on November 16, 2023, in a video interview with Daniel Gross of Rochester's WROC-TV after the Class Period ended, even Kochhar admitted that facilities like the Hub can cost up to $5 billion.

**Defendants Knew the Announced Timeline and Budget for the Hub Were False**

39.    CW1 served as Li-Cycle's Chief People Officer ("CPO") or head of Human Resources between April 2021 and January 2023.  CW1 reported directly to Johnston and Kochhar and regularly interacted with both Defendants.  As the CPO, CW1 was responsible for employee recruitment and development at the Company, including for all personnel at the Hub.  CW1 recalls that, in the fall of 2021, Defendants changed the Hub's design, expanding capacity, which increased complexity and infrastructure add-ons like extensive piping.  CW1 notes that, at that time, Li-Cycle did not account for the additional contractors and labor required to meet the demands for the Hub's expanded redesign.

40.    In January 2022, CW1 attended a meeting with members of the Company's Board of Directors, C-suite executives and all department heads. Both Johnston and Kochhar served on the Board and as Executive Chairman and CEO, respectively, at the time. CW1 states that at this January 2022 meeting, there was a lack of clarity on the Hub's budget, and the overall tone and demeanor of the participants present demonstrated that the project was headed in the wrong direction. After attending the January 2022 meeting, CW1 concluded that the project was out of control.

41.    According to CW1, Defendants limited their meetings with department heads after the January 2022 meeting to keep a tight lid on negative information concerning the Hub's budget and costs. However, CW1 regularly spoke to senior executives at Li-Cycle with personal knowledge of the Hub's rising costs. One of these individuals was Chris Biederman. Biederman served as the Company's Chief Technology Officer throughout the Class Period. An engineer by training with experience in mining industry projects, Biederman oversaw all of Li-Cycle's capital projects. According to CW1, Biederman oversaw construction at the Hub in early 2022, and he regularly met with the Individual Defendants.

42.    CW1 and Biederman discussed concerns about the Hub because CW1 was responsible for staffing at the Hub. CW1 states that, in early 2022, Biederman told CW1 that the cost of the Hub would exceed its original estimates. CW1 asserts that Biederman would have provided this information to Johnston and Kochhar. CW1 explains that the Hub required more than 1,000 indirect hires, and Biederman and CW1 explored how that number could be supported given the labor market conditions in Rochester. According to CW1, by the summer of 2022, Biederman and other executives knew that additional hiring outside Rochester would be required, causing an increase in costs to house the new hires from outside the area.

43.    CW1 also discussed the Hub with Connor Spollen.  Spollen served at Li-Cycle as the Senior Vice President of Project Delivery throughout the Class Period.  On his LinkedIn profile, Spollen writes that his job responsibilities include the deployment of the Hub to produce metal salts for the lithium iron market from recycled batteries.  CW1 states that Spollen ran the Hub on the ground.  CW1 says that, sometime in 2022, Spollen told CW1 that the true cost to commission the Hub was easily a billion dollars, and that Li-Cycle "was in deep shit."

44.    From CW1's perspective, it was clear that, as the Hub's costs escalated, the Individual Defendants tried to identify an upper limit of the costs, and likely decided that only an increase of up to 20% from the original costs would be reported to investors.  CW1 states that CW1 learned this from discussions with Biederman and other executives.  CW1 states further that, based on CW1's general discussions with the Individual Defendants concerning the budget, the Individual Defendants were aware that CW1 suspected that there were problems at the Hub.  CW1 explains that the Individual Defendants did not want investors to know the true costs to commission the Hub and believed that a grant from the DOE would make up for the shortfall to keep the project alive.

45.    CW1 observed that it was well-known within senior management that the Hub was underbudgeted, and the Company scrambled to tap more cash, but the required cash never came.

46.    Despite that fact, according to CW1, Johnston spent an excessive amount of money when the Hub was under development, taking private jets to Europe and Asia and spending lavishly on dinners and fine wine on the Company's dime.  CW1 further says that Johnston hired unnecessary employees and paid them excessive compensation.

47.    CW1 confirms that Defendants made false statements concerning the construction and commercialization of the Hub, including whether it was "on track" to initiate commissioning

in 2023.  Based on conversations with Biederman and Spollen, CW1 learned that the Hub would not be ready until 2025.

48.    CW1 also confirms that Johnston and Kochhar sold stock at suspicious times in the summer of 2023.

49.    CW2 corroborates CW1's account and provides additional information concerning Defendants' knowledge after CW1 left the Company in January 2023.  CW2 was a Senior Director of Learning and Development at Li-Cycle from October 11, 2021 to November 1, 2023.  CW2 reported directly to CW1 until January 2023, and then directly to Christine Barlow, the new CPO during the Class Period who took over from CW1.  CW2 was responsible for developing and implementing a training program for the Hub.  CW2 interacted with Johnston and Anthony Staley ("Staley") about the development and implementation of safety training at the Hub.  Staley has served at Li-Cycle as the Vice President of North America – Hub since May 2022.  On his current LinkedIn profile, Staley states that he has "[d]emonstrated leadership ability in P&L, project budget management, large hourly and professional FTE staff, and new plant startup."

50.    CW2 recalls that Spollen told CW2 to disregard the publicly declared timeline for the Hub's completion.  Spollen told CW2 that Johnston admitted to Spollen that the earliest the Hub could be commissioned was in 2024 (the year after the publicly declared commissioning date in 2023).  In particular, in April 2023, CW2 met Spollen for drinks at an Applebee's in Rochester.  At this meeting, Spollen told CW2 that Spollen had warned Johnston and Kochhar that the true cost of the Hub was between $850 million and $1 billion.  Despite actual knowledge, Johnston and Kochhar continued to egregiously lie to investors between April 2023 and November 2023 and reaped enormous profits from their fraud.  *See infra* at ¶¶101-09.  Spollen further told CW2 that

the engagement of multiple subcontractors at the Hub resulted in mounting costs with a 30% markup by the time the project could be completed.

51.     At another face-to-face meeting in August 2023, Spollen told CW2 that Li-Cycle had $200 million in cash, but the monthly cost of the Hub was at least $50 million. At this meeting, Spollen told CW2 that Defendants' declared timeline and budget for the Hub were always unrealistic.

52.     CW2 explains that, in the middle of 2023, Spollen and Staley intended to commission an electrical building at the Hub to satisfy investors, but Li-Cycle expected this building to ultimately shut down. CW2 opined that Defendants could not face investors by admitting to failure.

53.     CW2 also corroborates CW1's account that Johnston and Kochhar dumped their holdings at suspicious times, and that Johnston spent lavishly on private jets and gave new employees excessive pay packages and otherwise overspent.

54.     CW3 was a Senior Director of Global Talent and Acquisition at Li-Cycle from October 2021 to November 2023. During the Class Period, CW3 reported directly to CW1. CW3 managed executive recruiting at the Hub, and worked closely with business operations as the Hub expanded and the demand for hiring increased. CW3 hired both Spollen and Staley, and participated in weekly calls with Johnston. CW3 further corroborates the accounts of CW1 and CW2.

55.     In November 2022, CW3 states that CW3 understood the Hub was under financial strain. CW1, Staley and Spollen all told CW3 that Li-Cycle would not be able to fund completion because the true costs exceeded the cash the Company had on hand. CW3 states that, sometime in the middle of 2023 but no later than August 2023, Simpson sent a companywide email that

effectively ended all travel to and from the Hub, signaling the project's end. In addition, six months before Defendants announced a "pause" at the Hub, CW3 participated in calls concerning the Hub, and learned that the true costs of the Hub exceeded the Company's plan. Still, Defendants continued to mislead investors throughout 2023. *See infra* at ¶¶91-100.

56.    CW3 asserts that Defendants' declared costs to commission the Hub were unrealistic, and corroborates CW2's statement that the true costs were, at least, $50 million a month when the Company was running out of cash. CW3 knows these facts based on CW3's conversations with Spollen and Staley.

57.    CW4 was an Operations Office Administrator at Li-Cycle's Spoke in Tuscaloosa, Alabama from May 2023 to January 2024. CW4 tracked and managed the Spoke's inventory, expenses and overall budget. CW4 states that, on the morning of October 23, 2023, Defendants held a Company-wide meeting. According to CW4, at this meeting, Johnston admitted that Defendants did not plan for the rising costs and the Hub became too costly. During the same meeting, CW4 recalls Johnston stating that all projects, including the Spokes, would be paused.

**Defendants Seek a Bailout from the Government**

58.    On February 27, 2023, the Company announced that Li-Cycle entered into a conditional commitment for a $375 million loan (the "Conditional Commitment") with the U.S. DOE's Loan Programs Office ("LPO"), through its Advanced Technology Vehicle Manufacturing Program, which provides assistance to scale up production of lithium-ion batteries for the electric car market in the U.S. The Company touted the Conditional Commitment as another "significant milestone" in the development of the Hub that provided flexibility for expansion and future growth. However, by this point, Defendants knew or recklessly disregarded facts showing that the

Hub was not "on track" and Li-Cycle could not develop the Hub because it lacked the funds to do so.

59.    As the CW accounts demonstrate, by February 2023, Defendants also knew or recklessly disregarded the rising costs to commission the Hub, and sought loans from the government to delay the Hub's inevitable abandonment. *See supra* at ¶¶ 42, 43, 52, 55. Defendants represented the DOE's Conditional Commitment as nearing the finish line for the loan, with only "documentation" remaining. For instance, on an earnings call held on May 15, 2023, Kochhar claimed that there was "nothing major in terms of hurdles remaining to close" and it was "just documentation" and "really a lift on the legal side, primarily." On the same conference call, Simpson reinforced this notion, stating that "it is really just the volume of the administrative tasks in getting all papers to be fine on both sides, their side and ours."

60.    However, the Conditional Commitment was subject to several substantive requirements that Defendants could not meet. Specifically, Li-Cycle was required to fund a base equity commitment and ensure that buildings at the Hub were lien-free. Analysts ultimately noted that Li-Cycle would need to commit at least hundreds of millions of dollars in equity to receive funds from the LPO. As the costs of the project went up, so did the equity commitment as Kochhar conceded at an earnings conference call held on November 13, 2023. Pursuant to federal regulations, the DOE denies applications if equity for the proposed project cannot be provided by the time funds are dispersed to the borrower, "or such later time as DOE in its discretion may determine." 10 C.F.R. § 609.5(b)(5).

61.    In addition, the DOE's regulations require that: (1) the dispersed funds and all other funding available to a borrower be sufficient for expected and potential contingency amounts on the relevant project; (2) the borrower has a reasonable prospect of repaying all funds dispersed by

the LPO and fulfilling all other debt obligations; (3) the borrower pledges sufficient collateral or surety to secure the loan, as determined by DOE; (4) the loan is not subordinated in payment or lien priority to any other financing; and (5) the borrower has made or will make a significant equity investment in the project.  *See* 10 C.F.R. §§ 609.8(b)(5)-(7), (9), (17).

62.    Defendants could not meet any of these conditions since it was known as early as the beginning of 2022 that the Hub was not "on track" and its true costs would be twice what Defendants claimed.  *See supra* at ¶¶40-44, 47, 50, 51, 55.  Defendants never had the resources to fund the Hub's true costs, to make the equity investment required by the DOE, or to substantiate a reasonable prospect of repaying the proposed loan.  Thus, there was no basis to state that loans originated by the LPO would close at any point in 2023.  *See infra* at ¶¶80-81, 85-90, 95-98.

63.    In fact, as CW2 recounts, on either October 17, 2023 or October 18, 2023, the LPO raised concerns about how the Company would pay back the loan.  In addition, the LPO questioned Li-Cycle's high valuations for the costs of lithium.  As shown in the following chart, the price of lithium crashed over the Class Period as mining intensified in China.  Even though the lithium crash made it materially more difficult for Defendants to show an ability to repay the proposed loan, Defendants omitted this problem from their discussions with investors, deceptively indicating that only mere paperwork was left to receive government funds:



Lithium Carbonate (CNY/T) 96500.000   +1000.000 (+1.05%)

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

64. On January 27, 2022, the Company conducted an earnings call with investors and analysts, in which Kochhar said "***we will continue to execute on the Rochester Hub on time and on budget to support start-up in 2023***." Analyst PJ Juvekar asked a series of pointed questions about how the Company was controlling cost and budget for the Hub, and Johnston assured that the Company had taken steps to address those risks as follows:

> **Q - PJ Juvekar:** Just a couple of questions. First, on the Rochester Hub, you upsized that to 35,000 tonnes of black mass and you talked about being within budget for capital, but we're seeing labor shortages. We're seeing sort of raw material inflation; the Fed is talking about it. Are you seeing any of that in all the construction that you are doing? Is labor an issue? Can you just sort of talk about what you're seeing out there in the real conditions there?

> **A - Tim Johnston:** No problem, PJ. Happy to answer that. And so, let me address it in two parts. In relation to materials and equipment, we identified this early in the process, and I think that was really a very critical step for the organization. And so, what we did was, ***we actually brought forth a lot of our procurement activities into the front end of the project in order to guarantee pricing and supply****. The traditional way of building a project like this would be just-in-time delivery of these materials and equipment, but because of those risks that you identify there, PJ, we went against that, and we secured a*

*warehouse for example. We are able to address that through our procurement strategy.*

Labor is another very important one as we've been going through the process of selecting our general contractor, and we expect, as Ajay said in his earlier remarks to finalize that process in the next few weeks. ***We've actually gone through the process and quite detailed labor studies***, *but we're also looking to work with a contractor that has the ability to impart what we call self perform the work, which provides a certain level of reassurance in relation to that labor supply*.

We are fortunate to be in Rochester. Rochester is the basin for the surrounding area in the Northeast. We have the ability to pull labor from Buffalo or Syracuse and other proximal cities to Rochester. ***So, at this point in time, we don't see an issue with that, PJ. We have gone through, we've done the work, we understand what the costs are, we understand what the expected increase in inflation cost of labor are likely to be through the project, and all of that is budgeted in our plan***.

65.     The statements identified in Paragraph 64 above were materially false and/or misleading when made because: (a) the Company had not "guarantee[d] pricing and supply" through its procurement practices; and (b) the Company had not included in its budget "the expected increase in inflation cost of labor;" (c) the Hub's redesign in the fall of 2021 did not account for the additional contractors and labor required to complete the project as confirmed by CW1; and (d) as a result of (a), (b), and (c) the Company had not executed on budget and was not in a position to have a reasonable expectation that continued development would be "on budget."

66.     On August 5, 2022, Li-Cycle filed with the SEC a prospectus on Form 424B3 for a secondary offering used to raise money from investors, which stated the following about the Hub:

> Li-Cycle completed a definitive feasibility study for the Rochester Hub in December 2021. Based on the definitive feasibility study, Li-Cycle estimates that the Rochester Hub will be able to process battery material that is equivalent to approximately 225,000 EVs per year. Li-Cycle expects the Rochester Hub will have the nameplate input capacity to process 35,000 tonnes of black mass annually (equivalent to approximately 90,000 tonnes or 18 GWh of lithium-ion battery equivalent feed annually), resulting in expected output capacity of approximately 42,000 to 48,000 tonnes per annum of nickel sulphate, 7,500 to

8,500 tonnes per annum of lithium carbonate and 6,500 to 7,500 tonnes per annum of cobalt sulphate. ***Li-Cycle estimates that the Rochester Hub will require a total capital investment of approximately $485 million (+/-15%), based on the results of the definitive feasibility study, which can be funded from existing balance sheet cash and cash equivalents.***

67.    The statements identified in Paragraph 66 above were materially false and/or misleading when made because: (a) Spollen had already told CW1 that the costs of the Hub exceeded a billion dollars before these false statements were made; and as a result (b) Li-Cycle did not then estimate that the Hub would require a total capital investment of only $485 million; and (c) Defendants understated the total capital investment, as Biederman told CW1.

68.    The August 5, 2022 prospectus also deceptively minimized Johnston's role in a prior fraud perpetrated on investors:

> In addition to co-founding Li-Cycle, Mr. Johnston served as a director and the chief executive officer of Desert Lion Energy Inc. ("Desert Lion"), a lithium exploration and development company whose securities were listed on the TSX Venture Exchange (the "TSX-V"), from February 2018 to July 2019, when Desert Lion was sold to a third party. In mid-2019,the TSX-V initiated a review of the Desert Lion senior management team, including Mr. Johnston, to assess their suitability to act as directors or officers of a listed issuer as a result of certain incorrect statements and omissions made by Desert Lion in its press releases for a financing transaction and its listing application with the TSX-V for approval of the issuance of shares in connection with such transaction. On May 11, 2020, the TSX-V made a procedural determination that requires Mr. Johnston to make a written application to and obtain the prior written acceptance from the Compliance & Disclosure Department of the TSX-V for any proposed involvement by Mr. Johnston as a director or officer of (or to perform similar functions for) any TSX-V-listed issuer. The TSX-V has subsequently publicly stated that it has not reached any conclusions regarding the suitability of Mr. Johnston to be a director or officer of a TSX-V listed company in the future.

69.    The statements identified in Paragraph 68 above were materially misleading when made because: (a) the TSX-V ruling was not just a mere "procedural determination" but rather included substantive findings that Johnston's misconduct in connection with a false press release issued to investors violated exchange investor protection rules; (b) the statement implies that the TSX-V later softened that position when it in fact opposed any modification of its determination

on appeal; (c) on appeal, the BCSC upheld the determination of TSX-V, noting that Johnston was not pursued merely as a member of "Desert Lion senior management team," but because he personally signed the financing misrepresented to investors, personally was listed as the contact in the fraudulent press release and repeatedly submitted false information to the TSX-V.

70.     On September 14, 2022, Defendants caused Li-Cycle to issue an earnings press release which contained the same misrepresentations identified in Paragraph 66 above, which were materially false and misleading for the reasons identified in Paragraph 67 above.

71.     On September 14, 2022, Defendants also conducted a conference call with investors and analysts in which Simpson stated:

> ***We're pleased to report that our Rochester Hub project remains on schedule….***We maintained our first mover advantage in battery recycling in North America and Europe, which is underpinned by commercial contracts and strategic partnerships with the Rochester Hub as the key future value driver. ***And we are sufficiently funded to complete our current project pipeline with potential for debt financing from both traditional and government sources in support of future goals***.

and Johnston stated:

> We proved out the process of our hub with a large-scale pilot plant in Kingston, Ontario, which operated for over one year primarily between 2019 and 2020. We tested our flow sheet with known equipment and proven chemical processing technologies….
>
> During the third quarter, we have maintained our procurement momentum for providing enhanced confidence in material and equipment pricing to keep our projected timeline and cost within target….
>
> ***While we continue to monitor supply chain, labor costs, and seasonality conditions in Rochester, New York, the Hub remains on track to start commissioning in stages in 2023 . . . .***
>
> ***We have sufficient liquidity to fund our current projects pipeline and operating needs.*** In addition, we continue to evaluate multiple capital sources, including debt financing alternatives from both traditional and government sources in support of the next phase of growth beyond our current project pipeline.

Johnston also described that the commissioning of the Hub would occur in three stages, the final stage of which "is ultimately the introduction of black mass."  Kochhar added:

> *We have sufficient liquidity for our capital and operating needs to fund the current pipeline of projects in development and we are evaluating ways to further optimize our capital structure to support future growth*.

72.    The statements identified in Paragraph 71 above were materially false and misleading when made because: (a) Li-Cycle was not then currently funded for its pipeline of projects, the largest and most significant of which was the Hub; (b) Li-Cycle needed additional funds for the current projects themselves, not just to "support the next phase of growth beyond [its] current pipeline"; and (c) the statements omitted that Defendants already knew that the true cost of the Hub exceeded the Company's total cash position.

73.    On January 30, 2023, Defendants caused Li-Cycle to issue an earnings release that stated they had **"*[a]dvanced the Rochester Hub with key engineering, procurement, and construction milestones; continue to be on track for both project budget and schedule, to commence commissioning in late calendar 2023*"** and had "[*m*]**aintained project budget and schedule for the Rochester Hub**, expected to be the first commercial hydrometallurgical battery resource recovery facility in North America."  The press release further stated with respect to the Hub that the following "milestones" had been achieved that "***are expected to keep the project on track to initiate commissioning in late calendar 2023, and capital costs within the targeted budget ($486 million +/-15%)***":

- >90% process equipment ordered;

- ***Achieved nearly 75% completion of the warehouse and associated administration center for storage of black mass and finished battery-grade materials***;

- ***Progressed construction of the cobalt, nickel and manganese process buildings***;

- 65% of detailed engineering completed; and

- ***Largely completed civil works, underground utilities and electrical infrastructure***.

74.    The statements identified in Paragraph 73 above were materially false and misleading when made because: (a) they falsely implied that the budget for the Hub had only slipped by $1 million, from $485 million to $486 million, after having conducted the majority of procurement and significant construction and infrastructure, when it was already known the total costs of the project exceeded Defendants' purported budget; (b) Li-Cycle was not then "on track" to "keep…capital costs within the targeted budget"; (c) the statements omitted that the Hub's redesign did not take into consideration the costs of additional contractors and labor required for completion as confirmed by CW1; and (d) the true costs of the Hub exceeded the cash the Company had on hand, as CW1 and CW3 confirmed was known internally at the time of the statements.

75.    In an earnings conference call also held on January 30, 2023, Kochhar stated "***at our Rochester Hub, we made significant progress on engineering, procurement, and construction keeping it in line with our targeted budget and schedule.  We are reiterating that we expect commissioning to commence in late calendar 2023***." Johnston presented the following slide stressing that most of the work for the Hub was already complete:





Johnston described these as "**construction milestones**" for the Hub and stated:

> To reiterate a key part of our strategy was to accelerate the procurement of long-lead equipment and construction materials. ***This has proven to be a strategically significant advantage to maintain the project schedule. Specifically, key milestones include achieving nearly 75% completion of the warehouse and associated administration center for the storage of black mass and finished batterygrade materials. Progress the construction of the cobalt, nickel, and manganese processing buildings, largely completing civil works as well as underground utilities and electrical infrastructure.*** More than 90% of equipment has now been procured and we're nearing 65% completion on detailed engineering for the project. ***We are on track with our project budget and schedule. We are reiterating that we expect to commence commissioning in late 2023***.

Kochhar further stated: "we're ahead on permits, ***we're ahead on construction,*** we're ahead on procurement."

76.    The statements identified in Paragraph 75 above were materially false and misleading when made because: (a) Li-Cycle was not then "on track" with its "project budget"; (b) Li-Cycle's accelerated procurement had not "proven to be a strategically significant advantage"; (c) the statements omitted that the true costs of the project could be $1 billion as

26

Spollen told CW1 before these statements were made; (d) the statements omitted that the Company

did not then have the funds necessary to complete the Hub and was over budget as Biederman told

CW1 before these false statements were made; and (e) the statements omitted that costs were being

inflated by extravagant expenditures inconsistent with keeping on budget.

77.    On February 6, 2023, Li-Cycle filed with the SEC a form 20-F Annual Report,

which was signed by Kochhar and stated the following about the Hub:

**Rochester Hub**

Li-Cycle's first commercial Hub will be located in Rochester, New York, and is
currently under construction (the "Rochester Hub"). Li-Cycle's Spoke facilities
will be the primary suppliers of Black Mass & Equivalents feedstock for the
Rochester Hub. The location for the Rochester Hub was specifically selected
due to the nature of the infrastructure available at the site, including utilities and
road/rail networks.

Li-Cycle completed a definitive feasibility study for the Rochester Hub in
December 2021. Based on the definitive feasibility study, Li-Cycle expects the
Rochester Hub will have the nameplate input capacity to process 35,000 tonnes
of BM&E annually (equivalent to approximately 90,000 tonnes or 18 GWh of
LIB feed annually). The Rochester Hub is expected to have output capacity of
battery grade materials of approximately 42,000 to 48,000 tonnes per annum of
nickel sulphate, 7,500 to 8,500 tonnes per annum of lithium carbonate and 6,500
to 7,500 tonnes per annum of cobalt sulphate.

Li-Cycle has engaged Hatch Ltd. as its engineering and procurement contractor
for the Rochester Hub. Hatch Ltd. is also providing select construction
management services such as onsite field engineering support and overall
project scheduling for the project. Li-Cycle has engaged Mastec Inc. as its
general contractor for the Rochester Hub. Procurement activities are well-
advanced and have commenced on all equipment and select construction
materials for the Rochester Hub. Site works and construction commenced on the
Rochester Hub site in January 2022. ***The Rochester Hub has made significant
progress to date on key engineering, procurement and construction milestones
and is expected to initiate commissioning in stages in late calendar 2023***.

78.    The statements identified in Paragraph 77 above were materially false and

misleading when made because they omitted the following: (a) that Li-Cycle was then over budget

and not on track to complete the Hub at the cost previously reported to investors, $486 million; (b)

that the Hub's true costs were already known to be up to a $1 billion ; (c) that the Company did

not then have the funds necessary to complete the Hub; and (d) that costs were being inflated by

extravagant expenditures inconsistent with keeping on budget.

79.    The February 6, 2023 Form 20-F also contained the same misrepresentations about

Johnston's prior history of securities fraud identified in Paragraph 68 above which were materially

false and/or misleading for the reasons described in Paragraph 69 above.

80.    On February 27, 2023, Defendants caused Li-Cycle to issue a press release

including quotes from Kochhar and Simpson about a $375 million loan from the DOE, which

stated:

> Li-Cycle Holdings Corp. (NYSE: LICY) ("Li-Cycle" or the "Company"), an
> industry leader in lithium-ion battery resource recovery and the leading lithium-
> ion battery recycler in North America, is pleased to announce that Li-Cycle and
> the U.S. Department of Energy ("DOE") Loan Programs Office ("LPO"),
> through its Advanced Technology Vehicles Manufacturing ("ATVM") program,
> have entered into a conditional commitment for a $375 million loan (the
> "Loan").
>
> ***The conditional commitment follows extensive DOE technical, market,
> financial and legal due diligence and marks another significant milestone
> endorsing Li-Cycle's development of the first commercial hydrometallurgical
> resource recovery facility in North America, located near Rochester, New
> York (the "Rochester Hub")***. This is the first conditional commitment from the
> DOE ATVM program for a sustainable pure-play battery materials recycling
> company and the program's main support for the lithium-ion battery recycling
> industry.
>
> ---
>
> "We would like to thank the DOE LPO team for their time, support and
> partnership during this process, and we look forward to our collective efforts to
> complete the final agreements," commented Debbie Simpson, Li-Cycle Chief
> Financial Officer. "***This strategic financing achieves our commitment to
> execute on additional funding opportunities with debt that best optimizes our
> capital structure. The possibility of this substantial amount of government
> funding at favorable terms enhances our already robust balance sheet and
> provides flexibility for continued expansion and future growth plans***."

81.     The statements identified in Paragraph 80 above were materially false and/or misleading when made because: (a) they omitted that the loan was dependent on Li-Cycle proving that it had "a reasonable prospect of repayment" of loan amounts, which it could not do; (b) Li-Cycle's balance sheet was not then "already robust"; (c) the loan was required for existing project construction, not just to "provide[] flexibility for continued expansion and future growth plans"; and (d) Defendants needed the government funds to keep the Hub alive as CW1 explained.

82.     On March 17, 2023, Li-Cycle filed its annual proxy materials, which were signed by Kochhar and Johnston.  The Management Information Circular contained therein contained the same misrepresentations about Johnston's prior history of securities fraud identified in Paragraph 68 above which were materially false and/or misleading for the reasons described in Paragraph 69 above.  It also stated that "***Li-Cycle continues to be on track to commence commissioning of the Rochester Hub in late calendar 2023***," which was materially false and/or misleading when made because they omitted the following: (a) that Li-Cycle was then over budget and not on track to complete the Hub at the cost previously reported to investors, $486 million; (b)  the Hub would not be ready until 2025, as Biederman and Spollen told CW1; and (c) that the Company did not then have the funds necessary to complete the Hub.

83.     On March 30, 2023, as a result of having changed its fiscal year to align with the calendar year, Li-Cycle reported earnings for the two-month period ending December 31, 2022. Its earnings press release quoted Kochhar as stating: "***At our Rochester Hub, we remain on schedule and were thrilled to receive a low-cost, long-term loan commitment for $375 million from the DOE, providing us with greater financial flexibility for additional network growth plans***."  It also stated with respect to the Hub that "[*t*]***he Company has continued to make significant strides on key engineering, procurement, and construction milestones, maintaining***

*the project schedule to initiate commissioning in late 2023. The Rochester Hub's construction costs are currently on track, trending towards the higher end of the previously disclosed budget range of $486 million to $560 million, with an expected investment of $250 million to $300 million in 2023*."

84.    The statements identified in Paragraph 83 above were materially false and/or misleading when made because: (a) they omitted that the loan was dependent on Li-Cycle proving that it had "a reasonable prospect of repayment" of loan amounts, which it could not do; (b) the previously disclosed budget was $486 million (+/- 15%), *i.e.* a range of $413.1 million to $558.9 million with a midpoint of $486 million, not Kochhar's new range of "$486 million to $560 million" with a midpoint of $523 million; (c) construction costs were not then "on track" to complete the Hub either within the previously-reported budget range or Kochhar's new budget range; (d) that Defendants needed the government funds to keep the project alive as CW1 states; and (e) that the Company did not then have the funds necessary to complete the Hub.

85.    Also on March 30, 2023, Defendants conducted an earnings conference call with investors and analysts.  On that call, Kochhar stated:

> *we continue to execute on our strategic objectives*, solidifying Li-Cycle's position and the development of the sustainable domestic EV battery supply chain in North America and Europe. To highlight some key achievements that we will discuss in greater detail, *we advanced the Rochester Hub construction and are on schedule to start commissioning in late 2023*. Expanded development of our global network of Spokes, marrying customer demand, and building feedstock for our Rochester Hub, enhanced our global position with additional battery supply chain participants including recently being named as a preferred battery recycling partner for KION, a leading global forklift and warehouse trucks supplier. And *strengthen our balance sheet with the U.S. Department of Energy's loan commitment for $375 million, which will enhance our financial flexibility for future network expansion*.

Johnston stated:

*This aerial view of the Rochester Hub in the early March shows significant progress since our last update just two months ago.* Major equipment is now on site or en route. *The warehouse is now 95% complete and we'll be ready for occupancy by late spring, and key process buildings are well advanced as you can see from the pictures.*

Turning to Slide 14 for an overview of the five key pillars driving the project schedule and budget for the Rochester Hub. The first three are well advanced, specifically equipment procurement with greater than 95% of process equipment ordered, key crystallizer equipment and solvent extraction equipment is now either on-site or in transit. Bulk procurement such as steel, cabling, and piping is largely completed. And detailed engineering is more than 75% complete and on track ahead of construction needs. The last two pillars are the current key focus to ensure an on plan, on-budget delivery.

*Labor unit rates are the installation costs associated with the construction labor and labor productivity is the total volume of labor required to complete the installation. Currently, we are comfortable with the combination of our rates and productivity. We are pleased to confirm when factoring the six pillars and the remaining drivers that we are currently on-track trending towards the higher end of the previously disclosed range of $486 million to $560 million.*

The slide to which Johnston referred is as follows:



86.    The statements identified in Paragraph 85 above were materially false and/or misleading when made because: (a) they omitted that the loan was dependent on Li-Cycle proving that it had "a reasonable prospect of repayment" of loan amounts, which it could not do; (b) the

previously disclosed budget was $486 million (+/- 15%), *i.e.* a range of $413.1 million to $558.9 million with a midpoint of $486 million, not a range of "$486 million to $560 million" with a midpoint of $523 million; (c) construction costs were not then "on track" to complete the Hub either within the previously-reported budget range or the new budget range; (d) Defendants needed the government funds to keep the project alive as CW1 states; (e) they omitted that the Company did not then have the funds necessary to complete the Hub; and (f) the Company could not deliver on-budget by controlling the pillars of labor costs (for which it said in 2022 it had already adjusted to accommodate for inflation) or productivity particularly because the redesign in the fall of 2021 did not take those factors into consideration.

87.    Also on March 30, 2023, the Company filed its Form 20-F annual report for the 2-month stub period created by the change of its fiscal year.  That filing, which was signed by Kochhar, stated as follows about the DOE loan and the Hub:

> ***Funding flexibility and building further balance sheet strength*** – On February 27, 2023, the Company announced that it had entered into a conditional commitment with the United States Department of Energy ("DOE") Loan Programs Office for a loan of up to $375 million (the "DOE Loan") through the DOE's Advanced Technology Vehicles Manufacturing program. The loan, which is to be used for the development of the Rochester Hub, would have a term of up to 12 years from financial close, and interest on the loan would be the 10-year U.S. Treasury rates from the date of each advance under the loan. ***The Company expects to close this transaction in Q2 2023, subject to completion of long form agreements and certain conditions to be satisfied prior to closing. The DOE Loan will build further balance sheet strength and liquidity in support of future growth for the Company***.
>
> ---
>
> ***The Rochester Hub has made significant progress to date on key engineering, procurement and construction milestones and is expected to initiate commissioning in stages in late 2023…. Li-Cycle estimates that the Rochester Hub will require a total capital investment of approximately $486 million (+/- 15%) based on the definitive feasibility study. Costs for the Rochester Hub are trending towards the higher end of the budgeted range, with spend to date of $123.1 million at December 31, 2022***.

88.    The statements identified in Paragraph 87 above were materially false and/or misleading when made because: (a) the DOE loan was needed to complete the Hub, not just to "support future growth for the Company"; (b) they omitted that the loan was dependent on Li-Cycle proving that it had "a reasonable prospect of repayment" of loan amounts, which it could not do; (c) Li-Cycle was not then on track to complete the Hub within even "the higher end of the budgeted range"; (d) Defendants scrambled for government funds to keep the project alive as CW1 states; and (e) they omitted that the Company did not then have the funds necessary to complete the Hub.

89.    On May 15, 2023, Defendants caused Li-Cycle to issue an earnings press release, which stated that the Company had *"[p]rogressed $375 million loan commitment from U.S. Department of Energy (DOE), with close on track for mid-2023*," and that:

> *The Rochester Hub has continued to make significant strides on construction milestones, with procurement of long lead process equipment ahead of schedule and detailed engineering largely completed. The project remains on schedule for commissioning in late 2023 with construction costs within budget, trending at the higher end of the $486 million to $560 million range*.

90.    The statements identified in Paragraph 89 above were materially false and/or misleading when made because: (a) the DOE loan was not "on track" to close in mid-2023; (b) they omitted that the loan was dependent on Li-Cycle proving that it had "a reasonable prospect of repayment" of loan amounts, which it could not do; (c) Li-Cycle was not then on track to complete the Hub "within budget"; (d) the true cost of the Hub was between $850 million and $1 billion before these false statements were made as CW2 confirms that Spollen had warned Johnston and Kochhar; and (e) they omitted that the Company did not then have the funds necessary to complete the Hub.

91.    On May 15, 2023, Defendants also conducted an earnings conference call with investors and analysts, in which Johnston stated the following with respect to the Hub:

> ***All aspects of construction are moving in parallel and in line with our expectations, which demonstrates the strength and expertise of our team***.
>
> ***Turning to Slide 8 for further details on construction progress. First, as we've consistently shared, the Hub is on track to commence commissioning in May 2023 and is currently tracking at the high end of the previously disclosed construction cost range***. Early on, a key aspect of our construction strategy was to accelerate the procurement of long-lead equipment, and construction materials, first[ph] they will arrive on-site well ahead of when they are anticipated to be needed.
>
> ***Strategically, this has proven to be a significant advantage both in terms of our ability to maintain our project schedule and our ability to remain within budget, particularly in light of the challenging inflationary and supply chain environment***.

Johnston also presented the following slide:

### Rochester Hub: Advanced Long Lead Process Equipment and Bulk Material Procurement; Enables On-Time Construction Schedule






NICKEL: interior work underway
COBALT: exterior complete/ interior work underway
MANGANESE: exterior approaching completion
PIPE RACK: construction progressing
SOLVENT EXTRACTION EQUIPMENT: on-site
CRYSTALLIZER: equipment on-site and en route

**Commentary**

➢ On-track to commence commissioning in late 2023

➢ Construction costs largely locked-in with current focus on labor unit rates and productivity

➢ Total construction costs remain in line with prior stated budget, trending at the higher end of $486 million — $560 million range

 Li-Cycle    8

92.    The statements identified in Paragraph 91 above were materially false and/or misleading when made because: (a) the budget was already exceeding previously-articulated

expectations; (b) the Hub was not "on track" to "commence commissioning in May 2023" or "within budget"; (c) the true cost of the Hub was between $850 million and $1 billion before these false statements were made as CW2 confirms that Spollen had warned Johnston and Kochhar; and (d) they omitted that the Company did not then have the funds necessary to complete the Hub.

93.     At the same conference call, Kochhar claimed that there was "nothing major in terms of hurdles remaining to close" the loan from the DOE and it was "just documentation" and "really a lift on the legal side, primarily." On the same conference call, Simpson reinforced this notion, stating that "it is really just the volume of the administrative tasks in getting all papers to be fine on both sides, their side and our side."

94.     The statements identified in Paragraph 93 were materially false and misleading when made because (a) the conditions precedent to receiving loan funds went well beyond "just documentation" and "administrative tasks," and (b) Defendants did not have the funds to either meet the DOE's equity contribution requirement or to pay back the loan.

95.     On August 14, 2023, Defendants caused Li-Cycle to issue an earnings press release in which Kochhar stated "***the Rochester Hub remains on schedule to commence commissioning in late 2023***." The press release further stated:

> ***The Rochester Hub achieved significant milestones and remains on schedule to start commissioning in late 2023.*** Detailed engineering and procurement are nearly complete. ***Construction activities are progressing on site, with major buildings nearing completion, steel and concrete installation progressing, alongside the start of mechanical and electrical equipment installation. The Company is focused on actively managing the construction labor as part of the Rochester Hub construction budget of $560 million***.

96.     The statements identified in Paragraph 95 above were materially false and/or misleading when made because: (a) Li-Cycle then had no ability to complete the Hub for even the modified $560 million figure it then referenced as its "construction budget"; (b) the true cost of

the Hub was between $850 million and $1 billion before these false statements were made as CW2 confirms that Spollen had warned Johnston and Kochhar; (c) Li-Cycle's finances were then so strained that Simpson had already shut down travel signaling the Hub's end, as CW3 explains, and (d) the statements omitted that the Company did not then have the funds necessary to complete the Hub.

97.    Also on August 14, 2023, Defendants conducted a conference call with investors, in which Kochhar stated with respect to the Hub:

> *we significantly advanced construction with a continued expectation of the start of commissioning in late 2023…. We're also pleased to report that we are at the final stages of completing our process with the DOE, Loan Programs Office or LPO, and expect to close the $375 million loan in September 2023*.

Johnston stated:

> *As we stated on prior calls, we are focused on actively managing the construction labor in order to continue to execute relative to the construction budget of $560 million*.

Simpson stated:

> *As Ajay noted earlier, we made great strides and advanced documentation to the final stages depicted here at Stage 5 in the DOE LPO process. We are excited to share that our loan agreement is now working its way through the DOE's intraagency process. We are expecting to close the transaction in September 2023*.
>
> *Turning to Slide 15 for an update on our cash flow and a review of the strength of our balance sheet. During the second quarter, we invested $78 million in our network growth focused on the Rochester Hub ending the period with nearly $290 million of cash on hand. Adding the loan commitment of $375 million from the Department of Energy, we'll take our current pro-forma cash balance to more than $660 million*.

98.    The statements identified in Paragraph 97 were materially false and/or misleading when made because: (a) they omitted that the DOE loan was dependent on Li-Cycle proving that it had "a reasonable prospect of repayment" of loan amounts, which it could not do; (b) the

Company was in no position to "close the transaction in September 2023" because it could not meet any of the conditions precedent to the disbursal of government funds by this point; (c) Li-Cycle then had no ability to complete the Hub for even the modified $560 million figure it then referenced as its "construction budget"; (d) the true cost of the Hub was between $850 million and $1 billion before these false statements were made as CW2 confirms that Spollen had warned Johnston and Kochhar; (e) Li-Cycle's finances were then so strained that Simpson had already shut down travel signaling the Hub's end, as CW3 explains; and (f) the statements omitted that the Company did not then have the funds necessary to complete the Hub as confirmed by both CW2 and CW3.

99.     On August 18, 2023, Li-Cycle filed a registration statement for a shelf offering on Form F-3 seeking to raise up to $200 million by selling common stock to investors. Kochhar, Johnston and Simpson each signed the Form F-3, which stated with respect to the DOE loan:

> On February 27, 2023, the Company announced that it had entered into a conditional commitment with the United States Department of Energy ("DOE") Loan Programs Office for a loan of up to $375 million (the "DOE Loan") through the DOE's Advanced Technology Vehicles Manufacturing program. The DOE Loan, which is to be used for the development of the Rochester Hub, would have a term of up to 12 years from financial close, and interest on the loan would be the 10-year U.S. Treasury rates from the date of each advance under the loan. ***The Company expects to close the DOE Loan in September 2023. The DOE Loan will build further balance sheet strength and liquidity in support of future growth for the Company***.

100.     The statements identified in Paragraph 99 above were materially false and/or misleading when made because: (a) the DOE loan was needed to complete the Hub, not just to "build further balance sheet strength" or "support future growth for the Company"; (b) they omitted that the loan was dependent on Li-Cycle proving that it had "a reasonable prospect of repayment" of loan amounts, which it could not do; and (c) having failed to prove the reasonable prospect of repayment, Li-Cycle was not then positioned to close the loan in September 2023.

101.    On or about September 25, 2023, Li-Cycle issued a promotional video to investors about the Hub which was made available on YouTube, and linked to by Kochhar on LinkedIn. That video stated: "***We have made incredible progress developing our flagship Rochester Hub facility,***" and claimed that little remained to be done: "***The Rochester Hub warehouse is now complete, employees have moved into the office space, and we are preparing to start receiving black mass***":



The Rochester Hub warehouse is now complete, employees have moved into the office space, and we are preparing to start receiving black mass.

102.    The statements identified in Paragraph 101 above were materially false and/or misleading when made because: (a) they omitted that the Hub's costs had ballooned far beyond budgeted amounts; (b) the warehouse and process buildings were not even close to being complete but were encumbered and, as a result, the DOE would not approve the Conditional Commitment; (c) internal installation at the Hub remained virtually incomplete, (d) the remaining cost of completion exceeded more than half a billion dollars, and (e)  they omitted that the Company did not then have the funds necessary to complete the Hub.

## ADDITIONAL ALLEGATIONS OF SCIENTER

103.    Several facts demonstrate that Defendants knowingly made false statements or, at a minimum, acted with reckless disregard for the truth or falsity of their Class Period representations to investors.

104.    First, as Defendants themselves repeatedly stressed in earnings conference calls as well as SEC filings, the Hub was Li-Cycle's most important business initiative without which the Company could not be profitable.  As such, the Hub was a core operation of Li-Cycle.  That factor, in combination with other facts, contributes to an inference of scienter.

105.    Second, the CW accounts described in detail in Paragraphs 39 through 57 are based on conversations with high-level executives, such as Biederman, Spollen and Staley, who either oversaw the Hub's operations or had hands on experience with the Hub's development.  These high-level executives told the CWs, as early as the beginning of 2022, that the Hub's actual costs were drastically higher than what Defendants claimed the costs to be.  CW1 directly reported to Defendants and substantiates that Defendants knew that the project was headed in the wrong direction as early as January 2022.  Given the timing of CW2's meeting with Spollen at Applebee's (April 2023), Spollen had warned Johnston and Kochhar that the true cost of the Hub was between $850 million and $1 billion before they started to dump shares in May 2023.  Further, CW3's account confirms that Simpson acted to effectively shut the Hub down by banning all travel to and from the Hub, but Simpson nevertheless continued to make false statements after taking actions that signaled the Hub's end.  The CW accounts here, as fully described in more detail in Paragraphs 39 through 57, provide powerful evidence of fraud.

106.    Third, Defendants' own statements to investors show that they had access to information about the true costs of the Hub, and also knew or recklessly disregarded adverse facts

that were inconsistent with their positive, Class Period misrepresentations.  For example, on an earnings conference call held on June 14, 2022, in response to an analyst's questions about ramping up development at the Hub, Johnston said that "[o]ur attention now is really turning to focus on staffing requirements for the construction, and we're ramping up that team as we speak."  Johnston also repeatedly provided updates on construction to investors throughout the Class Period, particularly about the warehouse and the process buildings.  Thus, Johnston had access to information about the Hub and its development.

107.    In another example, on an earnings conference call held on January 30, 2023, Johnston told investors that 75% of the warehouse was complete.  On the same conference call, Kochhar stated that "we're ahead on construction."  Kochhar could not make that statement, true or false, unless he knew the true state of construction.  The only other inference is that Kochhar recklessly disregarded the truth when he made this specific representation.  On an earnings conference call held on March 30, 2023, Johnston told an analyst that "we continue to manage and monitor" construction costs "through the final execution of the project."

108.    Even Defendants' false statements suggest they knew or recklessly disregarded the truth.  All three Defendants repeatedly told investors that the Hub was "on track" and "on budget."  It was not.  Hence, Defendants either knew that the Hub was not on track and not on budget or if they did not know, then they were reckless not to know it.

109.    With respect to the DOE loan, on an earnings conference call held on May 15, 2023, Kochhar claimed that the primary hurdle to funding was "documentation," and Simpson rubber stamped this misrepresentation by mischaracterizing the serious obstacles as mere "administrative tasks."    These specific representations, at least, raise an inference that Defendants were

knowledgeable about the DOE requirements and regulations, and knew or recklessly disregarded that Li-Cycle was unlikely to both meet the equity contribution requirement or pay back the loan.

110.    <u>Fourth</u>, as fully described below in Paragraphs 111 through 119, Johnston's and Kochhar's Class Period stock sales are indicative of their motive to defraud investors.

**Johnston and Kochhar Profited from Fraud While Investors Suffered Losses**

111.    During the Class Period, Johnston and Kochhar took advantage of Li-Cycle's artificially inflated stock price to collectively reap approximately $11.5 million from sales of Li-Cycle common stock on the open market.

**Johnston's Class Period Stock Sales[2]**

| Date | Shares Sold | Proceeds | Price per Share |
|---|---|---|---|
| 06/16/2022 | 113,009 | $845,307.32 | $7.48 |
| 09/16/2022 | 20,413 | $124,633.61 | $6.11 |
| 02/03/2023 | 10,898 | $64,080.24 | $5.88 |
| 05/16/2023 | 159,640 | $709,631.73 | $4.45 |
| 05/17/2023 | 199,550 | $915,615.22 | $4.59 |
| 05/19/2023 | 2,000,000 | $2,626,960.00 | $1.31 |

112.    During the Class Period, Johnston sold 2,503,510 shares and reaped $5,286,228.12 in proceeds.[3]    Proceeds from these stock sales significantly exceeded Johnston's salary of $487,397 in 2022 and $286,850 in 2021.

113.    The vast majority of these sales took place during an extremely suspicious window of time in May 2023.  This is significant because the sales occurred after Spollen told CW2 in April 2023 that Spollen had warned Johnston and Kochhar that the true cost of the Hub was between ***$850 million and $1 billion***.

---

[2] This chart includes sales from Keperra Holdings Limited, a corporation organized under the laws of Ontario, of which Johnston is the sole shareholder. This chart excludes shares sold under automatic "sell to cover" tax liability transactions.
[3] As explained in Paragraph 115, some of these shares were pledged as security on May 19, 2023, for a trade expected to settle on August 18, 2024.

114.    On May 19, 2023, Johnston filed with the SEC an amendment to a previously filed Schedule 13D (the "Johnston 13D/A"). The Johnston 13D/A explains the actions taken over the suspicious four-day period between May 16, 2023 and May 19, 2023. On May 16, 2023, Johnston exercised previously granted options to acquire 159,640 shares of Li-Cycle's common stock at a price of $0.02 per share and, on the same day, sold the corresponding 159,640 shares of common stock for a weighted average price of approximately $4.45 per share. Then, on May 17, 2023, Johnston exercised previously granted options to acquire 199,550 shares of Li-Cycle's common stock at a price of $0.37 per share and, on the same day, sold the corresponding 199,550 shares of common stock for a weighted average price of approximately $4.59 per share.

115.    Additionally, the Johnston 13D/A disclosed that, on May 19, 2023, he entered into a variable prepaid forward contract with Citibank, N.A. ("Citibank"), involving a pledge of 2 million shares of Li-Cycle common stock.[4] Per a Form 3 filed on December 29, 2023 on Johnston's behalf, these 2 million shares were pledged to Citibank on May 19, 2023, in return for $2,626,960.00 in cash. Johnston could settle this trade on August 18, 2024, by simply giving Citibank those 2 million shares—even if they lost substantially all of their value by that time. This single, suspicious transaction enhances an inference of fraud given its temporal proximity to the announcement of disastrous news concerning the Hub.

116.    In the Form 144 filed on August 18, 2023, Johnston claimed that he "sold" the 2 million shares pursuant to a Rule 10b5-1 plan executed on May 19, 2023—the same day he entered into the variable forward contract with Citibank. This raises a strong inference that the trading

---

[4] Johnston entered into the variable prepaid forward contract through Keperra Holdings Ltd., a corporation organized under the laws of Ontario, of which Johnston is the sole shareholder. This chart excludes shares sold under automatic "sell to cover" tax liability transactions.

plan was concocted in bad faith, further strengthening an inference of fraud. The plan was executed after Johnston certainly knew material nonpublic, adverse information concerning an imminent disaster at the Hub.

**Kochhar's Class Period Stock Sales[5]**

| Date | Shares Sold | Proceed | Price per Share |
|------|-------------|---------|-----------------|
| 09/16/2022 | 20,413 | $124,633.61 | $6.11 |
| 02/03/2023 | 10,898 | $64,080.24 | $5.88 |
| 05/16/2023 | 159,640 | $709,599.80 | $4.45 |
| 05/17/2023 | 139,685 | $640,204.29 | $4.58 |
| 05/19/2023 | 1,000,000 | $3,580,880.00 | $3.58 |
| 08/18/2023 | 2,000,000 | $1,115,360.00 | $0.56 |

117.    During the Class Period, Kochhar sold 3,330,636 shares and reaped $6,234,757.94 in proceeds.[6] For comparison, Kochhar earned a salary of $487,397 in 2022 and $286,850 in 2021.

118.    Just like Johnston, the vast majority of Kochhar's sales occurred because of actions taken over a four-day period in May 2023, suggesting that Defendants coordinated on trading. On May 19, 2023, Kochhar filed an amendment to a previously filed Schedule 13D (the "Kochhar 13D/A") with the SEC. Kochhar did not file any Form 4s disclosing these sales. However, these sales were disclosed in a Form 144 that Kochhar filed on August 18, 2023.

119.    The Kochhar 13D/A shows that, like Johnston, on May 19, 2023, Kochhar entered into a variable forward contract with Citibank through 2829908 Delaware LLC. As part of this variable forward contract, Kochhar pledged 3 million shares of Li-Cycle held by 2829908 Delaware LLC. Per a Form 3 Kochhar filed on December 29, 2023, these 3 million shares were pledged in two separate transactions. First, 2829908 Delaware LLC pledged 2 million shares to

---

[5] This chart includes sales from 2829908 Delaware LLC, a Delaware limited liability company under Kochhar's control. It excludes shares sold under automatic "sell to cover" tax liability transactions.

[6] As explained in Paragraph 119, some of these shares were pledged as security in two separate transactions that would settle in August 2024 and November 2024.

Citibank on May 19, 2023, in return for $3,580,880.00 in cash.  Kochhar could then settle this trade on August 18, 2023, by simply giving Citibank those 2 million shares—even if they lost substantially all of their value by that time.  Second, 2829908 Delaware LLC pledged another million shares to Citibank on August 16, 2023, in return for $1,115,360.00 in cash.  Kochhar's suspicious transactions enhance an inference of fraud given their temporal proximity to the announcement of disastrous news concerning the Hub.

## PARTIAL DISCLOSURES

120.    On October 23, 2023, Li-Cycle issued a press release to announce a "pause" on construction work at the Hub because of "escalating construction costs."  Li-Cycle also disclosed that the total cost of the project exceeded its "previously disclosed guidance."  The Company's Board of Directors decided to review the project, including its construction strategy and future. The Company barely provided any details, but committed to provide more information about its near-term plans on November 13, 2023 when the Company expected to release the financial results for the third quarter of 2023.

121.    Upon this partial disclosure or the materialization of the concealed risks thereof, the Company's stock price plummeted by nearly 46% from its previous trading day closing price of $2.27 to close at $1.23 on extremely heavy trading volume.

122.    Analysts, as surrogates for the market, expressed alarm.  Cutting target and rating, an October 23, 2023 report by Cantor Fitzgerald noted that "[h]alting construction is a significant decision suggesting a lengthy delay to the construction schedule and/or financing that could strain the balance sheet. It also puts into question the timing and ability to secure the $375 MM DOE loan.  A full construction stop will compound the costs and extend the timeline further."  Analysts at Chardan Research similarly noted in an October 24, 2023 report that "[i]n our view, yesterday's

~46% share decline (Russell 2000 Index -0.9%) reflects investors' perception that issues run deeper." The analysts also "believe[d] that the recent sharp decline in the shares is a reflection of investor concern the DOE's loan commitment could be at risk."

123.    On November 13, 2023, the Company issued a press release to announce the financial results for the third quarter of 2023 and provide a business update. This press release disclosed that (1) Li-Cycle was taking steps "to preserve the Company's available cash," (2) the true cost of the Hub ranged between $850 million and $1 billion, and accounting for actual constructions costs caused Li-Cycle to recognize an impairment charge of $96.5 million, (3) the new cost figures for the Hub included the costs of the process buildings and the warehouse for the Hub in the amount of $140 million, and (4) the Company would need to raise additional capital to meet the Conditional Commitment's requirement to fund the equity component before any loan funds could be obtained.

124.    Also on November 13, 2023, the Company issued another press release to disclose that Moelis & Company, an investment bank, had been hired as a financial advisor to assist in "evaluating financing and strategic alternatives for the Company." In addition, on November 13, 2023, the Company filed with the SEC, on Form 6-K, its condensed consolidated interim financial statements for the third quarter of 2023. In the November 13, 2023 6-K, the Company disclosed that (1) on November 1, 2023, the Company implemented a cash preservation plan that resulted in the termination of employees and a halt in production at its Ontario Spoke, (2) rising costs at the Hub related to installation and labor costs associated with mechanical equipment, piping, structural steel, electrical and instrumentation for measurement and process control devices, and (3) the Company expected a refund for a substantial portion of $92 million it spent on the process buildings and the warehouse because of a lease back agreement that could not be implemented

"due to complexities in bringing them together with the planned DOE loan." On a conference call held on November 13, 2023, to discuss the financial results for the third quarter of 2023, Kochhar explained the "complexity" related to the DOE's concerns about encumbrance: "that arrangement would have a set of creditors and the DOE is another financing party, is part of the project. So it's always been that way along the course." With respect to the requirement that Li-Cycle raise additional funds as a condition precedent to any loan proceeds disbursed by the DOE, Kochhar conceded the requirement was "always" part of the process. At the November 13, 2023 earnings conference call, Simpson also disclosed that, in addition to the Conditional Commitment, the Company would need even more additional funding before it could restart the Hub project.

125.    Upon this partial disclosure or the materialization of the concealed risks thereof, the price of the Company's common stock plunged from its previous day closing price of $1.47 to close at $0.66 on November 14, 2023, again on extremely heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

126.    Plaintiff brings this Action as a Class Action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's common stock during the Class Period, and were damaged upon the revelation of the alleged corrective disclosures or materialization of the concealed risks. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

127.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Li-Cycle securities actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be

ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Further, during the Class Period, weekly trading volume averaged over 8,344,257 shares, with 176,254,266 shares outstanding. The high average trading volume and weekly turnover creates a strong presumption in favor of market efficiency. Record owners and other members of the Class may be identified from records maintained by Li-Cycle or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

128.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

129.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

130.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Li-Cycle;

- whether the Individual Defendants caused Li-Cycle to issue false and misleading statements during the Class Period;

- whether Defendants Kochhar, Johnston and Simpson were control persons of the Company;

- whether Defendants acted knowingly or recklessly in making false and misleading statements;

- whether the prices of Li-Cycle securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

131. A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a Class Action.

132. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations of fact were material;

- Li-Cycle securities traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Li-Cycle securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

133.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

134.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as fully described above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

135.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1through 134 above as if fully set forth herein.

136.    This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

137.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Li-Cycle securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Li-Cycle's

common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

138.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of SEC filings, press releases, presentations and statements made to investors in analyst calls described above, including statements made to securities analysts and the media that were designed to influence the market for Li-Cycle securities.  Such reports, filings, releases and public statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Hub.

139.    By virtue of their positions at Li-Cycle, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

140.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Li-Cycle, the Individual Defendants had knowledge of the details of Li-Cycle's internal affairs.

141.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Li-Cycle.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Li-Cycle's business, operations, financial condition and prospects.    As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Li-Cycle securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Li-Cycle's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Li-Cycle securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

142.    During the Class Period, Li-Cycle securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased, or otherwise acquired shares of Li-Cycle securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Li-Cycle securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Li-Cycle securities declined sharply upon the corrective

disclosures or the materialization of the concealed risks alleged herein to the injury of Plaintiff and other Class members.

143.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

144.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that Defendants made false and misleading statements concerning the Hub.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

145.    Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 144 as if fully set forth herein.

146.    During the Class Period, the Individual Defendants participated in the operation and management of Li-Cycle, and conducted and participated, directly and indirectly, in the conduct of Li-Cycle's business affairs.  Because of their senior positions, they knew or recklessly disregarded the adverse non-public information about the true cost of the Hub and the fact that it could not be commissioned in 2023.  Defendants also knew or recklessly disregarded that there was a high risk that the DOE loan would be denied because of the numerous conditions precedent to funding that Defendants could not meet.

147.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information concerning the Hub, and

to correct promptly any public statements issued by Li-Cycle which had become materially false or misleading.

148.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Li-Cycle disseminated in the marketplace during the Class Period concerning the Hub and Li-Cycle's operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Li-Cycle to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Li-Cycle within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Li-Cycle securities.

149.    Each of the Individual Defendants, therefore, acted as a controlling person of Li-Cycle.  By reason of their senior management positions and/or being directors of Li-Cycle, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Li-Cycle to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Li-Cycle and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

150.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Li-Cycle.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant Action may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class Representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.


Dated:  March 15, 2024                         Respectfully submitted,

                                               **POMERANTZ LLP**

                                               */s/ Omar Jafri*

                                               Joshua Silverman
                                               Omar Jafri
                                               Diego Martinez-Krippner
                                               10 S. LaSalle Street
                                               Chicago, IL 60603
                                               Telephone: 312-881-4850
                                               jbsilverman@pomlaw.com
                                               ojafri@pomlaw.com
                                               dmartinezk@pomlaw.com

                                               *Attorneys for Plaintiff*

                                               **PORTNOY LAW FIRM**

                                               Lesley F. Portnoy, Esq.
                                               1800 Century Park East, Suite 600

Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Plaintiff*