UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ THOMAS  HUBIACK,  Individually       │
│ and on Behalf of All Others          │
│ Similarly Situated,                  │
│                                      │
│         Plaintiff,                   │
│                                      │
│                                      │
│    -v-                               │
│                                      │
│ LI-CYCLE HOLDINGS CORP., AJAY        │
│ KOCHHAR,  TIM  JOHNSTON,  and        │
│ DEBORAH SIMPSON,                     │
│                                      │
│         Defendants.                  │
└─────────────────────────────────────┘
```

23-cv-9894 (JSR)


OPINION AND ORDER


JED S. RAKOFF, U.S.D.J.:

Defendant Li-Cycle Holdings Corp. ("Li-Cycle") is a Canadian company that recycles old batteries and battery manufacturing scrap to produce more valuable metals and, it hopes, new batteries for electric cars. Li-Cycle's latter goal was recently dashed after it paused construction on a purported hub facility, which would have been the site of its first foray into producing new battery grade material. After Li-Cycle announced the pause, its investors sued the company and three of its officers for securities fraud. The amended complaint largely alleges that defendants made false or materially misleading statements about the timeline and budget for the hub's construction. As explained below, the Court hereby grants defendants' motion to dismiss the amended complaint because it does not adequately allege an actionable false or misleading

- 1 -

statement and, in any event, fails to allege the requisite strong
inference of scienter.

I.    Factual and Procedural Background[1]

Li-Cycle was founded in 2016 by Ajay Kochhar and Tim Johnston,
who developed a vision "to recycle end of life batteries and scrap
into new lithium-ion battery packs for electric cars." ECF No. 44
("Am. Compl."), ¶¶ 2, 24.[2] The company became public in 2021. Id.
¶ 24. Li-Cycle's planned business model involves four "spoke"
facilities -- where old batteries and scrap are converted to "black
mass," "a powder-like substance that contains valuable metals such
as nickel, cobalt and lithium" -- and a "hub" facility, where the
resulting black mass is to be converted to battery grade materials
for more lucrative use. Id. ¶¶ 25-28. Although Li-Cycle's spoke
facilities are already in operation, construction of its first hub

---

[1] As the Court must when evaluating a motion to dismiss, the Court
"assume[s] the truth of the facts alleged in the operative
complaint." DeVillier v. Texas, 601 U.S. 285, 288 n.1 (2024).

[2] Johnston served as the CEO of a Canadian lithium exploration and
development company, Desert Lion Energy Inc., from February 2018
to July 2019. A Canadian stock exchange "found that Johnston made
material misrepresentations to investors" by omitting certain
details from a document regarding a proposed $5,000,000 financing,
viz., "that the arrangement was subject to a $1,000,000 discount
and a covenant that could give rise to a default." Id. ¶¶ 29-30.
In May 2020, the exchange published a decision requiring Johnston
to seek its permission before again serving as a director or
officer of any listed company. Id. ¶ 32.

facility, planned for Rochester, New York, halted in October 2023 because of rising construction costs. Id. ¶¶ 3, 120.

Defendants first announced their plan to build a hub facility in Rochester in September 2020. Id. ¶ 3. After an initial investment in the hub of $175 million, Li-Cycle upgraded its plans so that the hub could process 40% more black mass annually. Id. ¶ 34. During a conference call on December 14, 2021, Johnston explained that Li-Cycle had conducted a "definitive feasibility study" for the upgraded hub that showed "a fully loaded estimated capital investment of approximately $485 million." Id. ¶ 35. On January 27, 2022, in an earnings call with investors and analysts, Kochhar stated that Li-Cycle "will continue to execute on the Rochester Hub on time and on budget to support start-up in 2023." Id. ¶ 64. Li-Cycle shared the results of its definitive feasibility study with investors in an August 5, 2022 SEC filing. Id. ¶ 66. The filing explained, inter alia, "Li-Cycle estimates that the Rochester Hub will require a total capital investment of approximately $485 million (+/- 15%), based on the results of the definitive feasibility study, which can be funded from existing balance sheet cash and cash equivalents." Id.[3]

---

[3] The filing also described the Canadian stock exchange's ruling regarding Johnston's previous company, Desert Lion Energy, explaining that the exchange "made a procedural determination that

On September 14, 2022, Li-Cycle discussed the hub's progress in a conference call with investors and analysts. Li-Cycle's CFO, Deborah Simpson, stated that the "project remains on schedule" and that Li-Cycle was "sufficiently funded to complete our current project pipeline with potential for debt financing from both traditional and government sources in support of future goals." Id. ¶ 71. Johnston added that "[w]hile we continue to monitor supply chain, labor costs, and seasonality conditions in Rochester, New York, the Hub remains on track to start commissioning in stages in 2023." Id.

Li-Cycle reiterated as much, and provided additional details about its construction milestones, in a January 30, 2023 earnings release. See id. ¶ 73 (stating that Li-Cycle "advanced the Rochester Hub with key engineering, procurement, and construction milestones" and "continue[s] to be on track for both project budget and schedule, to commence commissioning in late calendar 2023"); id. ("expected to keep the project on track to initiate commissioning in late calendar 2023, and capital costs within the

---

requires Mr. Johnston to make a written application to and obtain the prior written acceptance from the Compliance & Disclosure Department . . . for any proposed involvement by Mr. Johnston as a director or officer" of an issuer listed on that exchange. Id. ¶ 68.

targeted budget"). More concretely, the release stated that Li-Cycle had "[a]chieved nearly 75% completion of the warehouse and associated administration center for storage of black mass and finished battery-grade materials," "[p]rogressed construction of the cobalt, nickel and manganese process buildings," completed "65% of detailed engineering," and "[l]argely completed civil works, underground utilities and electrical infrastructure." Id. At a conference call the same day, Johnston presented a slide stating that the Rochester hub "remains on track to initiate commissioning in late calendar 2023." Id. ¶ 75. The slide included a graphic showing that commissioning would begin in late 2023 but continue indefinitely into at least 2024. Id. A February 2023 SEC filing again stated, "The Rochester Hub has made significant progress to date on key engineering, procurement and construction milestones and is expected to initiate commissioning in stages in late calendar 2023." Id. ¶ 77.

On February 27, 2023, Li-Cycle announced in a press release that it had "entered into a conditional commitment" with the U.S. Department of Energy ("DOE") "for a $375 million loan." Id. ¶ 80. The press release explained that "[t]he conditional commitment follows extensive DOE technical, market, financial, and legal due diligence and marks another significant milestone endorsing Li-Cycle's development of the first commercial hydrometallurgical

resource recovery facility in North America, located near Rochester, New York." Id. The press release also included a quote from Simpson, stating that "[t]he possibility of this substantial amount of government funding at favorable terms enhances our already robust balance sheet and provides flexibility for continued expansion and future growth plans." Id.

In a March 30, 2023 press release, Li-Cycle again noted its award of the DOE loan commitment and discussed the progress of the Rochester hub construction. In particular, it explained, "[t]he Rochester Hub's construction costs are currently on track, trending towards the higher end of the previously disclosed budget range of $486 million to $560 million, with an expected investment of $250 million to $300 million in 2023." Id. ¶ 83.[4] In an earnings video call the same day, Johnston showed an "aerial view of the Rochester Hub in . . . early March," which he described as "show[ing] significant progress since our last update just two months ago." Id. ¶ 85. In particular, "[t]he warehouse is now 95% complete and [will] be ready for occupancy by late spring, and key process buildings are well advanced." Id. Li-Cycle also filed

---

[4] The amended complaint elsewhere alleges that Li-Cycle had stated the budget as $485 million, rather than $486 million. See, e.g., Am. Compl. ¶ 66.

another SEC report that day, noting that it "expects to close [the DOE loan] transaction in Q2 2023, subject to completion of long form agreements and certain conditions to be satisfied prior to closing." Id. ¶ 87.

Li-Cycle's updates were similar in a May 15, 2023 press release and earnings call. The press release reported that the "close" of the DOE loan was "on track for mid-2023," and that "[t]he Rochester Hub has continued to make significant strides on construction milestones, with procurement of long lead process equipment ahead of schedule and detailed engineering largely completed." Id. ¶ 89. It continued, "The project remains on schedule for commissioning in late 2023 with construction costs within budget, trending at the higher end of the $486 million to $560 million range." Id. During the earnings call that day, Kochhar stated that there was "nothing major in terms of hurdles remaining to close" the DOE loan and that it was "just documentation," "really a lift on the legal side, primarily." Id. ¶ 93. Similarly, Simpson added that "it is really just the volume of the administrative tasks in getting all papers to be fine on both sides." Id.

In an August 14, 2023 conference call, Kochhar reported that Li-Cycle was "at the final stages of completing our process with the DOE, Loan Programs Office or LPO, and expect[s] to close the

- 7 -

$375 million loan in September 2023." Id. ¶ 97. At that point, Simpson explained, the "loan agreement is now working its way through the DOE's intraagency process." Id. Separately, she noted that during Q2 2023, Li-Cycle "invested $78 million in our network growth focused on the Rochester Hub ending the period with nearly $290 million of cash on hand." Id. ¶ 97. Although Li-Cycle did not close the DOE loan in September 2023, that month the company released a promotional video for the hub declaring that "[t]he Rochester Hub warehouse is now complete, employees have moved into the office space, and we are preparing to start receiving black mass." Id. ¶ 101.

The tide turned in October 2023. On October 23, 2023, Li-Cycle announced a "pause" of work at the hub because of "escalating construction costs." Id. ¶ 120. A press release that day stated that the construction costs exceeded "previously disclosed guidance," noting that more details would follow when Li-Cycle next released financial results. Id. In response to that news, Li-Cycle's trading price fell by nearly 46%, from $2.27 to $1.23. Id. ¶ 121. When Li-Cycle released its financial results for Q3 2023 on November 13, it stated that the cost of the hub had ballooned to between $850 million to $1 billion, and that the company "would need to raise additional capital to meet the [DOE] Conditional Commitment's requirement to fund the equity component before any

loan funds could be obtained." Id. ¶ 123. That day, Li-Cycle's trading price fell from $1.47 to $0.66. Id. ¶ 125.

As the amended complaint tells it, however, Li-Cycle's public statements about the budget and timeline of the Rochester hub were, from the very beginning, littered with false or misleading statements. According to a confidential witness (CW1) who was head of human resources at Li-Cycle from April 2021 to January 2023, at a January 2022 Li-Cycle board meeting, "there was a lack of clarity on the Hub's budget, and the overall tone and demeanor of the participants present demonstrated that the project was headed in the wrong direction." Id. ¶ 40. CW1 personally "concluded that the project was out of control." Id. CW1 believes that, after the January 2022 meeting, defendants "limited their meetings with department heads . . . to keep a tight lid on negative information concerning the Hub's budget and costs." Id. ¶ 41.

CW1 "regularly spoke to senior executives at Li-Cycle with personal knowledge of the Hub's rising costs," including Chris Biederman, who "oversaw all of Li-Cycle's capital projects," and Chris Spollen, the Senior Vice President of Project Delivery. Id. ¶¶ 41-43. Sometime in 2022, Spollen told CW1 "that the true cost to commission the Hub was easily a billion dollars, and that Li-Cycle 'was in deep shit.'" Id. ¶ 43. "From CW1's perspective, it was clear that, as the Hub's costs escalated," Li-Cycle's

executives "tried to identify an upper limit of the costs, and likely decided that only an increase of up to 20% from the original costs would be reported to investors." Id. ¶ 44.

Another confidential witness (CW2) who worked in human resources, Li-Cycle's Senior Director of Learning and Development from October 2021 to November 2023, tells a similar tale. Id. ¶ 49. In April 2023, Spollen told CW2 "that Spollen had warned Johnston and Kochhar that the true cost of the Hub was between $850 million and $1 billion," even though Li-Cycle's reported cost to investors was far lower. Id. ¶ 50. Shortly thereafter, in May 2023, Johnston and Kochhar collectively sold roughly $11.5 million of Li-Cycle shares. Id. ¶¶ 111-13. In August 2023, Spollen told CW2 that Li-Cycle's "declared timeline and budget for the Hub were always unrealistic." Id. ¶ 51. A third confidential witness (CW3), who worked in human resources at the same time as CW2 and also reported directly to CW1, likewise reports understanding as early as November 2022 that "the Hub was under financial strain." Id. ¶ 55.

On November 8, 2023, Li-Cycle investor Rachel Davis filed this putative class action against Li-Cycle and its two co-founders, Kochhar and Johnston. ECF No. 1. On February 21, 2024, after a hearing, the Court appointed Thomas Hubiack as Lead Plaintiff and appointed Hubiack's counsel, Pomerantz LLP and The

- 10 -

Portnoy Law Firm, as Class Counsel. ECF No. 36. Hubiack filed an amended complaint on March 18, 2024. The amended complaint added Simpson, Li-Cycle's CFO, as a defendant, and brings claims for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, and for control person liability of the individual defendants under Section 20(a). Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) on April 12, 2024. ECF No. 49 ("Mem."). Hubiack filed opposition papers on April 26, 2024, ECF No. 53 ("Opp."), and defendants replied on May 3, 2024, ECF No. 54 ("Reply"). The Court held oral argument on the motion on May 23, 2024.

## II.  Legal Background

"To state a private securities-fraud claim under section 10(b) and Rule 10b-5, a plaintiff must plead (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." In re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th 408, 417 (2d Cir. 2023).[5] A claim for control person liability

---

[5] Here and elsewhere, internal alterations, citations, and quotation marks have been omitted.

under Section 20(a) requires, _inter alia_, alleging a "primary violation" by the controlled defendant of an Exchange Act violation. Id. at 429.

"Pursuant to Rule 9(b) [of the Federal Rules of Civil Procedure], a complaint sounding in fraud also must state with particularity the circumstances constituting fraud, and under the [Private Securities Litigation Reform Act ("PSLRA")], it must 'specify each statement alleged to have been misleading and the reason why the statement is misleading,' and 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Id. at 416-17 (quoting 15 U.S.C. § 78u-4(b)(1), (2)(A)).

"To meet the scienter requirement in a 10b-5 action under the PSLRA, a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Emps. Ret. Sys. of the Virgin Islands v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "This state of mind requires a showing of intent to deceive, manipulate, or defraud, or recklessness." Id. "[T]he scienter requirement is met where the complaint alleges facts showing either: 1) a motive and opportunity to commit the fraud; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." Id. at 306. To pass muster against a motion to

dismiss, "an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).

III. Analysis

A. The amended complaint fails to allege an actionable misstatement or omission.

While, as Hubiack's aforementioned allegations indicate, this lawsuit is not without some arguable suggestion of fraud, the allegations fail to meet the applicable requirements necessary to transform speculation into legally cognizable claims. At bottom, Hubiack's theory of the case is that defendants committed fraud by intentionally or recklessly misstating or omitting material information about the cost and progress of the construction at the Rochester hub facility. Viewed in light of the amended complaint's well-pleaded allegations, such a theory runs headlong into at least two foundational principles of the federal securities laws. First, "[f]raud depends on the state of events when a statement is made, not on what happens later." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 262 (2d Cir. 2016). In other words, "a statement true when made does not become fraudulent because things unexpectedly go wrong." Id. Second, Section "10(b) and Rule 10b-5(b) do not

create an affirmative duty to disclose any and all material information." <u>Macquarie Infrastructure Corp. v. Moab Partners, L.P.</u>, 601 U.S. 257, 264 (2024). Because "Rule 10b-5(b)," on which the entire amended complaint rests, "does not proscribe pure omissions," "[d]isclosure is required . . . only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." <u>Id.</u>

The amended complaint's alleged misstatements fall into three general categories: statements about the progress of the Rochester hub, statements about the DOE conditional loan commitment, and statements about Li-Cycle co-founder Johnston's sanction by a Canadian stock exchange. The same fundamental problem afflicts the allegations for each category: the amended complaint fails to plausibly allege that any particular statement was false or misleading when it was made.

<u>Progress of the Rochester Hub</u>. Many of the amended complaint's alleged misstatements about the progress of the Rochester hub are simply too broad or vague to be actionable under the federal securities laws. When a company offers "vague descriptions" of its activities, such as "generally optimistic opinions" about its progress, such statements "are too general to cause a reasonable investor to rely upon them and therefore are precisely the type of puffery that [the Second Circuit has] consistently held to be

inactionable." In re Philip Morris Int'l Inc., 89 F.4th at 417 (emphasis omitted). Numerous of the amended complaint's suggested misstatements fall into this category. See Am. Compl. ¶ 64 ("we will continue to execute on the Rochester Hub on time and on budget to support start-up in 2023"), ¶ 71 ("the Hub remains on track"), ¶ 73 ("advanced the Rochester Hub with key engineering, procurement, and construction milestones; continue to be on track for both project budget and schedule"), ¶ 75 (similar; "a strategically significant advantage to maintain the project schedule"), ¶ 77 (similar), ¶ 85 ("we continue to execute on our strategic objectives"), ¶ 91 ("significant advantage both in terms of our ability to maintain our project schedule and our ability to remain within budget"); ¶ 95 ("Rochester Hub achieved significant milestones"), ¶ 101 ("We have made incredible progress developing our flagship Rochester Hub facility"). Such statements are unavailing because "expressions of puffery and corporate optimism do not give rise to securities violations." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).

While the amended complaint identifies some other statements that do contain definite representations of present fact, it does not plausibly allege any contemporaneous contrary facts that would render the identified statements false or misleading. For instance, the amended complaint highlights defendants' repeated

statements in early and summer 2023 that the hub's construction costs were "trending towards the higher end of the . . . disclosed budget range of $486 million to $560 million," which Hubiack contends were fraudulent remarks because, in late fall, Li-Cycle paused the hub project and reported that the company then understood the true cost of the hub to be "between $850 million and $1 billion." Am. Compl. ¶¶ 3, 38, 83, 85, 89, 95, 97, 123.

The federal securities laws do not countenance Hubiack's theory of fraud by hindsight. "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." Rombach, 355 F.3d at 174; accord Am. Compl. ¶ 95 ("The Company is focused on actively managing the construction labor as part of the Rochester Hub construction budget of $560 million."). As the amended complaint itself discusses, Li-Cycle's budget was based on estimates from a December 2021 "definitive feasibility study" showing "that the Rochester Hub will require a total capital investment of approximately $485 million (+/- 15%)," which meant an upper estimate of about $560 million. Id. ¶ 66.

Nowhere does the amended complaint allege that the feasibility study was somehow flawed or unreliable.[6] In fact, at oral argument, Hubiack's counsel specifically disclaimed any such suggestion. See Transcript of 5/23/24 Arg. Instead, the amended complaint largely contains hazy allegations that, after the feasibility study but before fall 2023 when the hub project was paused, confidential witnesses who worked in human resources did not believe that Li-Cycle could meet its targets. E.g., Am. Compl. ¶ 5 ("In early 2022, CW1 explains that CW1 attended a meeting where Defendants were present, and the tone and demeanor of the attendees demonstrated that the Hub was headed in the wrong direction."). Much of the amended complaint's allegations from confidential witnesses consist not of facts or concrete details but of rank speculation. E.g., id. ¶ 44 ("From CW1's perspective, it was clear that, as the Hub's costs escalated, the Individual Defendants tried to identify an upper limit of the costs, and likely decided that only an increase of up to 20% from the original costs would be reported to investors. . . . CW1 states further that, based on

---

[6] The amended complaint takes issue with Li-Cycle's rounding, because 15% added to $485 million is $557.75 million, not $560 million exactly. See Am. Compl. ¶ 84. It is hardly worth mentioning that stating an approximate number in what is explicitly labeled a construction cost estimate (one that never purports to be exact) cannot be the basis for a fraud claim.

CW1's  general  discussions  with  the  Individual  Defendants concerning the budget, the Individual Defendants were aware that CW1 suspected that there were problems at the Hub." (emphasis added)), ¶ 45 ("CW1 observed that it was well-known within senior management that the Hub was underbudgeted").[7]

Nor does the amended complaint at any point allege that, before fall 2023 when the higher construction cost was announced and the hub project was paused, defendants had data that called into question the definitive feasibility study. On that front, the amended complaint relies almost entirely on two confidential witnesses' assertions that Li-Cycle's Senior Vice President of Project Delivery, Connor Spollen, "ran the Hub on the ground" and himself believed "that the true cost to commission the Hub was easily a billion dollars, and that Li-Cycle 'was in deep shit.'" Id. ¶ 43. For instance, the amended complaint recounts that CW2

---

[7] Defendants also challenge the assertions of the confidential witnesses as inadmissible hearsay. See Mem. at 14. That argument is, at best, premature, as a court must accept a complaint's well-pleaded allegations as true regardless of any concern over whether a plaintiff will ultimately prove such allegations through admissible evidence. See Lynch v. City of New York, 952 F.3d 67, 82 (2d Cir. 2020) ("[A]dmissibility . . . is an issue for trial or summary judgment; in order to state a claim that is sufficiently plausible to avoid dismissal at the pleading stage, the fact asserted need not be presented in a form that would be admissible at trial.").

met Spollen for drinks in April 2023 at a Rochester Applebee's, where "Spollen told CW2 that Spollen had warned Johnston and Kochhar that the true cost of the Hub was between $850 million and $1 billion." Id. ¶ 50. The amended complaint asserts based on this allegation that Li-Cycle's co-founders had "actual knowledge" that the hub's construction was misrepresented. Id. But, even taking the truth of the factual allegations as given, the amended complaint provides no details about the source of Spollen's beliefs, how he communicated his "warn[ing]" to two of the defendants, what information Spollen relied on, or how widely, consistently, or precisely he shared that information with others at Li-Cycle. Id. At most, the amended complaint alleges that one frustrated employee with significant responsibilities at the hub believed that Li-Cycle's definitive feasibility study was a severe underestimation, and that the employee shared his misgivings with a coworker in a different department -- human resources -- while imbibing. Such indefinite workplace gossip -- even if eventually proven correct -- does not clear the PSLRA's hurdle for alleging that defendants' statements, which were based on concrete data the amended complaint nowhere disputes, were false or misleading when made. See Rombach, 355 F.3d at 174 ("[P]laintiffs must do more than say that the statements in the press releases were false and

misleading; they must <u>demonstrate with specificity</u> why and how that is so." (emphasis added)).

Other statements in the amended complaint about the hub's progress describe specific milestones or rates of completion that no alleged facts contradict. For instance, the amended complaint describes press releases in which Li-Cycle states that, on particular dates, ">90% process equipment ordered"; that Li-Cycle "[a]chieved nearly 75% completion of the warehouse and associated administration center for storage of black mass and finished battery-grade materials"; and that "65% of detailed engineering [was] completed." Am. Compl. ¶ 73. The amended complaint similarly displays pictures shared by defendants at investor video calls that demonstrate concrete advancement of construction, and even show that by September 2023, the storage warehouse for black mass at the hub facility was entirely complete. <u>Id.</u> ¶¶ 91, 101. Contrary to Hubiack's theory of liability, the fact that the hub was ultimately paused because of higher construction costs does not somehow mean or make plausible that these documented advancements never occurred or were the product of a fraudulent mirage.[8] If

---

[8] The same is true for defendants' statements that they were on track to initiate commissioning of the hub in stages beginning in late 2023. <u>E.g.</u>, Am. Compl. ¶¶ 3, 38, 47, 71, 73, 75, 77. The amended complaint never alleges specific facts showing that defendants did not legitimately anticipate beginning the hub's

anything, these allegations undermine rather than bolster the notion that defendants' budget estimates before fall 2023 were false or misleading when made.

In sum, the amended complaint's identified statements about the progress of the hub's construction are either too general to be actionable or are not sufficiently shown to have been false or misleading when they were made.[9]

<u>DOE Conditional Loan Commitment</u>. The amended complaint alleges that defendants misrepresented the circumstances of Li-Cycle's $375 million conditional loan commitment from DOE. In particular, Hubiack argues that defendants suggested that the hub could be fully funded even without the DOE loan, when in reality,

─────────────────

commissioning in late 2023 at the time of those representations. Nor do defendants' statements ever suggest that commissioning would be complete in 2023. In fact, the amended complaint itself includes a chart from a Li-Cycle investor video call in which defendants conveyed that commissioning would continue, at the least, into 2024. <u>See id.</u> ¶ 75. The amended complaint's vague allegation that "CW1 learned that the Hub would not be ready until 2025," which nowhere explains what "ready" means in this context, thus does not contradict or render misleading any specific representations. <u>Id.</u> ¶ 47.

[9] Given these conclusions, the Court need not reach defendants' additional argument that many statements -- such as those discussing Li-Cycle's expectations or representing that the hub's construction was "on track" -- are additionally subject to the PSLRA's safe harbor for forward-looking statements. Mem. at 11-13.

defendants always planned to use some of the DOE money to fund the hub's construction. See Opp. at 11-12. But Hubiack's argument relies on reading inferences and assertions into defendants' statements that are not plausibly there. For instance, the amended complaint points to statements by defendant Simpson, Li-Cycle's CFO, that the "strategic financing" from DOE "achieves our commitment to execute on additional funding opportunities that best optimizes our capital structure." Am. Compl. ¶ 80. Similarly, Simpson added, "[t]he possibility of this substantial amount of government funding at favorable terms enhances our already robust balance sheet and provides flexibility for continued expansion and future growth plans." Id.; see also id. ¶¶ 85, 87 (similarly worded statements). Such statements recognize that the DOE loan is, as its name suggests, merely "conditional" and nowhere convey that the DOE funds, if awarded, would not be used to aid in the hub's construction budget in addition to supporting future growth and flexibility.

Hubiack also argues that defendants committed fraud by concealing their purported knowledge that they were incapable of meeting the equity contribution requirement for the DOE loan. See Opp. at 11-12. That argument lacks support in the amended complaint's well-pleaded allegations. The amended complaint alleges no facts showing that defendants definitively could not

meet the DOE's targets, or were at serious risk of not meeting such targets, before the hub's construction was paused. It bears repeating that "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." Rombach, 355 F.3d at 174.

Johnston's Sanction by a Canadian Stock Exchange. Finally, the amended complaint alleges that defendants omitted key facts about a Canadian stock exchange's requirement that Li-Cycle co-founder Johnston receive its permission before again serving as an officer or director of an issuer listed on that exchange. Am. Compl. ¶ 68. The amended complaint takes specific issue with Li-Cycle's categorization of the stock exchange's requirement as a "procedural determination," rather than as "substantive findings that Johnston's misconduct in connection with a false press release issued to investors violated exchange investor protection rules." Id. ¶ 69.

But on its face, Li-Cycle's description in an August 2022 prospectus, quoted in the amended complaint, fairly captures what Hubiack alleges occurred. The prospectus explains that Johnston was "a director and the chief executive officer of Desert Lion Energy Inc. ('Desert Lion'), a lithium exploration and development

company whose securities were listed on the TSX Venture Exchange (the 'TSX-V')." Id. ¶ 68. It explains that "the TSX-V initiated a review of the Desert Lion senior management team, including Mr. Johnston, to assess their suitability to act as directors or officers of a listed issuer as a result of certain incorrect statements and omissions made by Desert Lion in its press releases for a financing transaction." Id. It then adds that, as a result of that review, "the TSX-V made a procedural determination that requires Mr. Johnston to make a written application to and obtain the prior written acceptance from the Compliance & Disclosure Department of the TSX-V for any proposed involvement by Mr. Johnston as a director or officer of . . . any TSX-V-listed issuer." Id. In context, it is clear that Li-Cycle described the "procedural determination" as such because "[t]he TSX-V has subsequently publicly stated that it has not reached any conclusions regarding the suitability of Mr. Johnston to be a director or officer of a TSX-V listed company in the future." Id. In other words, Li-Cycle accurately disclosed that TSX-V set forth a procedure for Johnston to follow while reserving judgment on a

substantive finding resulting from that procedure. The federal securities laws require no more.[10]

In sum, the amended complaint fails to allege with the requisite particularity an actionable statement that is false or misleading. That fact dooms both the Rule 10b-5 claim and the Section 20(a) claim for control person liability of the individual defendants. See In re Philip Morris Int'l Inc., 89 F.4th at 429.[11]

---

[10] To the extent Hubiack suggests that Li-Cycle committed fraud by failing to disclose additional details about Desert Lion's false or misleading statements or Johnston's specific involvement in those statements, such an argument is not one that creates liability for federal securities fraud. "Rule 10b-5(b) does not proscribe pure omissions," no matter how material they may be to a reasonable investor. Macquarie Infrastructure Corp., 601 U.S. at 264. Moreover, even if the omissions were otherwise actionable, the amended complaint has not pleaded any loss causation stemming from them.

[11] Defendants separately argue that, if the Court were to deny the motion to dismiss, the Court should nevertheless strike allegations of misstatements made after Hubiack himself purchased Li-Cycle stock because he could not have relied on them in connection with the purchase or sale of a security. The Court need not address this argument because the complaint fails to state a claim. That said, this argument fails for two reasons. First, it construes the reliance element of a securities fraud claim in an unduly narrow way. For instance, Hubiack may have held on to shares he would otherwise have sold because of defendants' continued representations. See In re Vivendi, S.A., 838 F.3d at 259 ("There is no reason to draw any legal distinction between fraudulent statements that wrongfully prolong the presence of inflation in a stock price and fraudulent statements that initially introduce that inflation."). Second, because this is a putative class action, the fact that Hubiack as lead plaintiff may have relied on only

B. <u>The amended complaint fails to state a securities fraud claim for the independent reason that it does not adequately allege scienter.</u>

Even if the amended complaint had sufficiently pleaded an actionable false or misleading statement, the amended complaint would still need to be dismissed for the independent reason that it does not adequately allege scienter. While scienter may be satisfied by either intent to defraud or recklessness, <u>see</u> <u>Blanford</u>, 794 F.3d at 205, "Congress require[s] plaintiffs to plead with particularity facts that give rise to a 'strong' -- <u>i.e.</u>, a powerful or cogent -- inference" of scienter, <u>Tellabs</u>, 551 U.S. at 323. "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." <u>Id.</u> at 323-24. "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' -- it must be cogent and compelling, thus strong in light of other explanations." <u>Id.</u> at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts

---

some of defendants' statements poses a potential Rule 23 problem but not necessarily a Rule 12(b)(6) problem.

alleged." Id. Here, the inference of scienter pales when compared to the far more compelling inference that defendants, try as they might, were led astray by a feasibility study (the validity and reliability of which are unchallenged in the amended complaint) that did not accurately foresee the difficulties attending the hub's construction.

In contending that the amended complaint has shown "a motive and opportunity to commit the fraud," Blanford, 794 F.3d at 205, Hubiack points to allegations that, in May 2023, shortly after they were supposedly warned by a Li-Cycle senior vice president working at the hub that it was severely underbudgeted, defendants "Kochhar and Johnston personally benefitted from the fraud by selling more than $11.5 million worth of Li-Cycle stock in unusual transactions, as well as entering into prepaid forward contracts to constructively sell millions' more." Opp. at 24 (citing Am. Compl. ¶¶ 111-19). But, upon examination, those sales are far less suspicious than Hubiack suggests. Most tellingly, "Johnston's ownership remained consistent throughout the Class Period, while Kochhar's increased." Mem. at 21-22.[12] If Hubiack's theory were

_____

[12] Defendants derive these ownership figures from Li-Cycle's public SEC filings. Hubiack makes no argument or suggestion that it is improper for the Court to consider such filings in evaluating this aspect of the motion to dismiss.

correct that Johnston and Kochhar were seeking to profit from selling fraudulently overvalued shares, there is no economically sensible explanation for why either defendant would hold constant -- let alone increase -- his holdings before, as each defendant would have known would happen, the share price inevitably fell when the hub failed to come to fruition. Indeed, the May 2023 sales were roughly five months before the first alleged corrective disclosures on October 23, 2023. Courts routinely hold that such an attenuated gap between stock sales and corrective disclosures sap an inference of scienter. See, e.g., In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) ("Plaintiffs' allegations are empty vessels, as the trades occurred . . . many months before the release of any negative information that caused Gildan's stock price to plummet."); In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 275 (S.D.N.Y. 2008) (making the same point and citing similar cases).

Hubiack also advances several arguments for why the amended complaint has sufficiently pleaded "strong circumstantial evidence of . . . recklessness." Blanford, 794 F.3d at 206. First, Hubiack argues that the accounts of confidential witnesses demonstrate scienter because "their accounts are based on conversations with key executives who had personal knowledge, technical expertise, and hands on experience with construction at the Hub." Opp. at 22.

- 28 -

But the actual allegations from confidential witnesses in the amended complaint are largely vague and speculative. See supra, at 16-19. Even the most specific evidence of scienter asserted by a confidential witness -- the allegation that Li-Cycle's Senior Vice President of Project Delivery, Connor Spollen, told CW2 that he "warned" Li-Cycle's co-founders that the hub could easily cost up to a billion dollars, Am. Compl. ¶ 92 -- is far too sparse to support an adequate inference of scienter. That allegation contains no details about what Spollen knew, how he knew it, or what exactly he conveyed as his "warn[ing]." Id. The amended complaint provides no reason to conclude that it was reckless for defendants to credit the data-driven figures of the definitive feasibility study over Spollen's bare assertion.

Second, Hubiack asserts -- without basis in the amended complaint -- that "[d]efendants had extensive access to information undermining their statements to investors, including the fact that the Company had not satisfied DOE loan requirements." Opp. at 22. But that argument seeks to divine scienter from the mere (assumed) fact of falsity itself and fails to distinguish between scienter and ignorance or negligence. That defendants had not yet satisfied the DOE loan requirements does not mean that defendants did not legitimately believe they would eventually do so based on available information. See Rombach, 355 F.3d at 174.

- 29 -

Third, in a similarly styled argument, Hubiack contends that the partial corrective disclosures of one defendant, Li-Cycle co-founder Kochhar, are themselves evidence of scienter. Opp. at 23 (citing Am. Compl. ¶ 124). Such logic once more fails to account for the competing, common-sense inference that defendants simply gained more information over time. And it again elides any distinction between, on the one hand, ignorance or negligence, and on the other, scienter.

Fourth, Hubiack notes that "Defendants held themselves out to investors and analysts as knowledgeable about the cost of the Hub and the DOE loan." Id. at 23; see id. at 24 (invoking the "core operations doctrine" that "[w]here defendants concede that a subject is 'critical' . . . they cannot pretend to lack knowledge about it"). While that may increase the reasonableness of an inference of scienter, it is not enough to cross the line into the "compelling" camp. It remains entirely consistent with defendants' statements -- indeed, more compelling than an inference of fraudulent intent or recklessness -- that they simply mismanaged the hub project rather than that they intentionally riled up investors with excitement over a project they supposedly knew was doomed to fail and publicized a loan they purportedly knew would never come. Hubiack's theory of scienter would require crediting the unlikely inference that defendants likewise managed to

- 30 -

hoodwink the DOE, which was confident enough in the plans for the hub that it awarded a $375 million conditional loan commitment after "extensive DOE technical, market, financial and legal due diligence." Am. Compl. ¶ 80.

Finally, Hubiack argues that defendant "Johnston's history of misrepresenting facts to investors, as recognized by Canadian regulators, bolsters the inference of fraud here." Opp. at 24. That logic, suggesting that Johnston has a propensity to defraud investors because he allegedly did so under unelaborated circumstances once before, is tenuous at best. The amended complaint provides scant detail on Johnston's particular involvement in Desert Lion's misstatements. Moreover, although there is no admissibility threshold for pleadings, see Lynch, 952 F.3d at 82, such a propensity inference is exactly the kind that Federal Rule of Evidence 404 prohibits, precisely because, inter alia, "[c]haracter evidence is of slight probative value and may be very prejudicial." Fed. R. Evid. 404, Notes of Advisory Committee on Proposed Rules. An inference of such limited probative value cannot carry the day in establishing a compelling inference of scienter, particularly where the amended complaint affords precious little context.

IV.  Conclusion

For the two independently sufficient reasons that the amended complaint neither alleges an actionable false or misleading statement nor sufficiently alleges a strong inference of scienter, the Court hereby grants defendants' motion to dismiss the amended complaint. Hubiack has neither sought leave to amend the complaint for a second time in the event of dismissal nor remotely suggested that there are additional facts he could allege to cure any deficiencies. Accordingly, the Court dismisses the amended complaint with prejudice. The Clerk is respectfully directed to close document 48 on the docket of this case and to enter final judgment.

SO ORDERED.

New York, NY
June 10, 2024

JED S. RAKOFF, U.S.D.J.